## THE STATE v. KLOSS, *Appellant.*

### Division Two, November 9, 1893.

1. **Criminal Law**: MURDER: MANSLAUGHTER. The fact that an aged cripple replies to impertinent and insulting questions asked him by defendant, a young and vigorous man, "none of your d—n business" and shoves defendant and raises his hand as if to strike him, does not reduce to manslaughter a series of brutal assaults made on the old man by defendant who knocked him down and kicked him to death, and defendant cannot complain of a verdict finding him guilty of murder in the second degree.

2. ——: ——: SELF-DEFENSE: INSTRUCTIONS. The fact that some one, after the deceased had been twice knocked down called out that he was getting his gun did not authorize the defendant to again attack and jump on him without even looking to see if he was getting or had a pistol, and the refusal of the court to instruct on the law of self-defense was not error.

*Appeal from Nodaway Circuit Court.*—HON. C. A. ANTHONY, Judge.

AFFIRMED.

THE defendant killed Patrick H. Thompson by beating him with his fist and kicking him to death. He was indicted, charged with murder in the first degree, and on trial was convicted of murder in the second degree, his punishment being assessed at ten years in the penitentiary, the lowest term of punishment provided by law for the perpetration of that crime, the trial court refusing or declining to give any instructions for a higher grade of crime than that of which defendant was found guilty.

The substance of the evidence adduced at the trial is as follows: Patrick H. Thompson was an aged man some eighty years old, as testified to by Ashford, who had known him several years. He was a spectacle

peddler by occupation, a cripple who used a crutch and. a cane to walk with, and on the occasion in question he supported himself with his crutch, while he held the cane over his shoulder, and on it he carried a satchel which contained his small stock in trade; his little all. On February 15, 1893, about seven o'clock in the evening of that day, he was wending his way slowly along the public road which runs along the dividing line between Andrew and Nodaway counties. He had chosen the latter county as the scene of his humble labors. While he was proceeding along the road, it being a starlight night and objects quite easily discernable, he was overtaken by Al. Cunningham and defendant Albert Kloss, who were driving in a buggy. They drove on to Elijah Jackson's house, near by, stopping to inquire about some colts. There Kloss, who was wholly unacquainted with Thompson, told young Jackson, who came up to the road in answer to his call, "there is an old man down there in the road, he will burn the barn down unless you let him stay at your house all night." Thereupon at defendant's invitation, young Jackson went down with him to the road to see Thompson and met him coming up the road with his crutch under his arm, a cane over his shoulder with a satchel on it. The defendant began a conversation with him by saying: "Howdy do, old man, what are you doing?" Old man Thompson said: "None of your business." Defendant: "You want a night's lodging?" Thompson: "Yes." Defendant: "You can't stay." Thompson: "Do you live up there?" Defendant: "Certainly I do." Thompson: "Can't you keep me all night?" Defendant: "No, what are you going to do about it?" Thompson: "None of your business;" when defendant struck him in the face, knocking him down and kicking him in the side; about this time Cunningham appeared

and asked defendant why he had struck him, when defendant said: "I have struck him down." Just then the old man started to raise his head and the defendant said: "Don't raise your head or I'll stomp the liver out of you," and he then the second time knocked him down and kicked him. The old man begged the boys to help him up and not let defendant strike him any more. He was raised to his feet, but unable to stand, or to hold in his hands his crutch or cane, was laid back upon the ground.

About this time a Mr. Marshall came down the road and some one suggested that he go and get a lantern, which he did, and when he returned defendant said "he was very sorry he had knocked him (the old man) down, and said he would not do it any more." They then attempted to get the old man up again, who, being unable to stand, reached out toward defendand to help himself up, when defendant said: "G—d d—n you, you can't stick your hands in my pocket," and again struck the old man and knocked him down, when all present told defendant to stop and begged him not to hit the old man any more. About that time defendant claimed to have lost his ring and the boys took the lantern and began making search for it; and when some one said: "The old man in getting in his valise," the defendant again struck the old cripple, jumped on to him and began beating him in the face and kicking him in the head. With much difficulty the four young men who were present pulled defendant off of him, and even after that, as the old man attempted to raise his head from the ground, the defendant again kicked him in the head; the defendant at the time had on a pair of heavy boots.

The testimony, except that of defendant, shows that no resistance of any character, no assault, no violent or abusive language was made, used or applied

by the old peddler toward the defendant; that his assault on this harmless old cripple was unprovoked and without excuse.

The crowd dispersed, when young Jackson went home, and when his father came back home, narrated his trouble to him, and they, with some of the neighbors, returned, found the old man where the assault had been committed; they then carried him to the home of Mr. Jackson, where they bathed him, applied hot, wet cloths to his feet and finally sent for a doctor, who, upon examination, found that Thompson's skull had been fractured, a dint in his head that you could lay your finger in, his nose seemed broken and several severe bruises and cuts inflicted upon his face and head and side, from the result of which, two days later (February 17) he died. The attending physician stated that death was occasioned by the injuries inflicted by defendant. No autopsy was held on the deceased and so the extent of his injuries cannot be known. Thompson was unconscious from the time he was carried from the road to Jackson's home.

The testimony is that the assault was committed, and most of the injuries inflicted, on the north side of the road, and in Nodaway county, and that deceased died in that county. After the old man died, his clothing, valise and effects were searched and no weapons of any character were found. A warrant being issued immediately for the arrest of defendant, he could not be found, but about a week later was located and arrested in Oklahoma Territory, whither he had fled, and where he was in jail.

There was testimony adduced for the defense to the effect that, just before the defendant jumped on the old man for the last time, some one cried, "look out, he is getting his gun;" but the testimony of some of the witnesses is that the only thing uttered was, "the

old man is getting into his satchel." There was also testimony that, as the cry mentioned was made, whatever it was, the defendant said, as he sprang on the old man with both feet, "God d——n you, you can't draw no gun on me." But the defendant denied that he made use of any such exclamation. He also denied that he told young Jackson about a man being down the road who would burn the barn, etc., though this is positively testified to by Jackson. The defendant attempted to excuse his conduct by saying that old man Thompson told him, in response to his question, "it's none of your d——n business," and shoved him and raised his hand as if he was going to strike him, etc.; but he does not deny the statement of Jackson that he told old man Thompson, "don't raise your head or I'll stomp the liver out òf you," nor does he deny the other statements heretofore related. He claims, indeed, that he was acting in self-defense when he jumped on the aged, decrepit and crippled man the third and last time; that he was afraid that the poor old creature would shoot him or hurt him, at a time, too, when all the evidence shows that the old man was incapable of raising his head from the ground only for a moment, and that after receiving his *coup de grace* from the brutal kick of defendant, "his head dropped to the ground and he never moved his head from the ground *no more*." Nor did he speak afterwards.

This, in brief, was the testimony, and upon that the trial court, at the instance of the prosecuting attorney, eliminated the element of murder in the first degree from the indictment, and instructed the jury as to that offense in the second degree.

An instruction was also given as to manslaughter in the second degree. The eleventh instruction was the following: '

"11. If the jury believe from all the evidence that, at the time the defendant struck and kicked the said Thompson (if you believe from the evidence that defendant did kick the said Thompson), and inflicted the injuries from which the said Thompson afterwards died, the defendant was acting under a violent passion, suddenly aroused by reason of Thompson having used toward defendant insulting and abusive language, and having shoved or struck him with his hand or stick, or by reason of a reasonable apprehension upon the part of the defendant that Thompson was in the act of drawing some weapon upon him for the purpose of killing him or inflicting upon him some personal injury, you cannot find the defendant guilty of murder, for, in that case, the law presumes that such injuries were inflicted without malice, but by reason of such passion. On the other hand, although you may believe that defendant struck and kicked the said Thompson while in a violent passion, suddenly aroused as above stated, yet, if you shall further believe, from all the evidence, that such injuries to Thompson were inflicted by the defendant and that such injuries were not necessary to the self-defense of the defendant, as explained in other instructions, you will find the defendant guilty of manslaughter in the fourth degree, so stating in your verdict, and assess his punishment at imprisonment in the penitentiary for a period of two years, or at imprisonment in the county jail for a period of not less than six months nor greater than one year, or by a fine of not less than $500, or by both a fine of not less than $100 and imprisonment in the county jail not less than three months."

In addition to that already quoted, another instruction was given on the law of self-defense. All of these instructions, as well as the others mentioned, were given by the court of its own motion,

This instruction about self-defense was given in the teeth of all the testimony that. the victim of the defendant's brutal rage was, except when held up by others, incapable of standing or sitting up; incapable of holding his cane or his crutch in his hands, lying prone on his back on the ground, and unable even to raise his head, except but for a moment. And the uncontradicted testimony of young Jackson also shows that, at the time the poor .old cripple was assaulted the last time, he was not even sitting up, but "kinder raised himself up with one hand to reach for his satchel."

It is unnecessary to particularize the nine instructions, to which objection is made; they are in stereotyped form and need no comment.

*W. W. Ramsay* with *George Crossan* and *J. L. Growney* for appellant.

(1) There is no evidence in the case at bar which intended to prove that the defendant, Kloss, "willfully," *i. e.*, "intentionally," "premeditatedly" *i. e.*, "with thought beforehand," "malice aforethought," *i. e.*, "with premeditation and a fatally mischievous purpose," killed Thompson. All of which should appear in the evidence, before the second degree of murder, in this state, can lawfully be submitted to a trial jury. *State v. Foster*, 61 Mo. 549; *State v. Gassert*, 65 Mo. 352; *State v. Weiners*, 66 Mo. 13; *State v. Shock*, 68 Mo. 552; *State v. Curtis*, 70 Mo. 594; *State v. Lewis*, 74 Mo. 222; *State v. Harris*, 76 Mo. 361; *State v. Cooper*, 71 Mo. 436; *State v. Wilson*, 98 Mo. 440; *State v. McKinzie*, 102 Mo. 629; *State v. Berkley*, 109 Mo. 665. (2) The court erred in giving instruction numbered 6, for the state. *State v. McKinzie*, 102 Mo. 628; *State v. Harris*, 76 Mo. .361. The word "malicious" is not synonymous with "malice aforethought." *State v.*

*McLaughlin*, 76 Mo. 391; 1 Bishop on Criminal Law, sec. 429; *Regina v. Griffifths*, 8 C. & P. 248. (3) The instruction was further wrong, in that it stated that, "although the defendant did not intend to kill," he was guilty of murder in the second degree. *State v. Gassert*, 65 Mo. 355 (s. c., 4 Mo. App. 44); *State v. Weiners*, 66 Mo. 13; *State v. Shock*, 68 Mo. 560; *State v. Curtis*, 70 Mo. 600; *State v. Robinson*, 73 Mo. 306. Premeditation is an essential element of murder in the second degree. *State v. Lewis*, 74 Mo. 222; *State v. Harris*, 76 Mo. 361; *State v. Bohanan*, 76 Mo. 562; *State v. Phelps*, 76 Mo. 319; 1 Hale's P. C. 428; *State v. Parsons*, 21 Ala. 301; *Com. v. Hacket*, 2 Allen, 141; *Livingston v. Com.*, 14 Gratt. 601.

*R. F. Walker*, Attorney General, for the state.

(1) The verdict in this case is supported by the testimony, which establishes a case of most brutal murder in the second degree, and, under the testimony, the jury would not have been warranted or authorized in finding defendant guilty of any other offense. (2) Under the testimony, establishing beyond question, a clear case of murder in the second degree, the court committed no error in submitting that question to the jury. There was no testimony in this case to authorize the trial court in confining and restricting the jury to manslaughter. *State v. Doyle*, 107 Mo. 43. (3) No error was committed by the trial court in the matter of giving instructions.

SHERWOOD, J.—I. As there were no errors committed against *the defendant* in the court below, either in giving, or in refusing, instructions, or in the admission or rejection of evidence, the judgment should, as to those points, unquestionably, be affirmed.

The defendant is not represented by counsel in this court, but, it is claimed in the motion for a new trial, that, "the evidence showed no greater offense than manslaughter, and the verdict for murder in the second degree should not be permitted to stand." With the view to meet this objection, the evidence contained in the worst and shabbiest transcript ever sent up to this court, has been carefully read and the substance of it given in the preceding statement.

Instead of the verdict being for too high a grade of homicide, the only wonder resulting from a perusal of the evidence is, that the jury were not permitted to inquire as to the defendant's guilt of *murder in the first degree.* The circumstances already related would surely furnish a sufficient basis for a conviction of that grade of crime. Indeed, it may, with confidence, be said that the whole range and realms of the annals of criminal jurisprudence scarcely furnish a more shocking and flagrant example of a cowardly and brutal murder unredeemed by a single palliating feature and unextenuated by a single substantial cause or excuse. Look at the case in outline: A man eighty years of age goes hobbling along on his crutch, bearing on his aged' shoulders a satchel containing the materials of his humble vocation. It is winter time, and cold; nightfall is about to overtake him on the public highway, and he applies at Murray's for shelter for the night; it is denied him, and so he goes trudging along to seek elsewhere. Nearing another dwelling he is passed by two young men in a buggy. It is then about dusk, but sufficiently light for them to easily discern what manner of man the wayfarer is (this is shown by the gratuitous falsehood told by defendant that, "there is an old man down in the road, and he will burn the barn unless," etc.). Shortly thereafter, the old man is approached on the public highway by two young men,

one of whom accosts him asking him impertinent questions and taunting him. The old man, as he had the right to do, replies to the questions: "None of your business," when he is immediately knocked down and brutally kicked in the side by the defendant, whose murderous feet were shod with heavy boots. Not satisfied with that, when the old man, a few moments later, attempted to raise his head, the defendant bawls out: "Don't you raise your head, or I'll stomp the liver out of you," and suiting actions to the words, again he knocks him flat with the earth and kicks him. Not satisfied with that he makes hypocritical professions of sorrow for what he had done, and promised not to do so any more; and, yet, when those present attempted to raise the old man up, and he, unable to stand, reached out toward defendant in the endeavor to hold himself up, defendant, eager for another chance at the old cripple, says: "G—d d—n you, you can't stick your hands in my pocket," and again struck the aged object of his unmanly rage, and knocked him down for the third time, and this, in spite of the remonstrances of those present. A few moments later, while the ring is being looked for, some one cries out: "Look out, he is getting in his valise," or "look out, he is getting his gun," when defendant, without looking to see if this were true, again jumped on the old man with both feet, and beat him and kicked him. By the united force of the four young men, defendant was, with difficulty, pulled off; and, not satisfied with this fourth attack, when his aged and helpless victim tried to raise his head for the last time on earth, defendant kicked him in the side of the head, making a place, as one of the witnesses says, "you could lay your finger in."

If these touching incidents of soul-sickening barbarity and brutal ferocity do not make out a case of "a heart regardless of social duty and fatally bent on

mischief," then it is needless to consult the authorities in order to discover what kind of *heart that is*.

We have said that the poor old cripple had the right to reply as he did to defendant's impertinent and taunting questions; this is true, even if he added to his answer the expletive of an oath. Such answers cannot be regarded as insulting, and mere words in such circumstances are no provocation; but if they were, and even if the old man "shoved" defendant away from him and afterwards raised his hand as if to strike him (as to which there is only defendant's unsupported testimony contradicted by that of young Jackson), still this would neither justify, excuse nor palliate defendant's subsequent outrageous conduct, out of all proportion, as it was, to what the old man had done, conceding it to be true that the deceased really used insulting words and did "shove" him.

This point is well illustrated by East, touching the subject of homicide in hot blood, where he says:

"It must not, however, be understood that any trivial provocation, which in point of law amounts to an assault, or even a blow, will of course reduce the crime of the party killing to manslaughter. This I know has been supposed by some, but there is no authority for it in the law. For where the punishment inflicted for a slight transgression of any sort is outrageous in its nature, either in the manner or the continuance of it, and beyond all proportion to the offense, it is rather to be considered as the effect of a brutal and diabolical malignity than of human frailty; it is one of the true symptoms of what the law denominates malice; and therefore the crime will amount to murder, notwithstanding such provocation. Barbarity, says Lord Holt, in *Keate's case*, will often make malice. 1 East P. C. 234. To the same effect see 2 Bishop's New Criminal Law, sec. 703, and cases cited.

Wharton says: "Violent acts of resentment, bearing no proportion to the provocation or insult, particularly where there is a decided preponderance of strength on the part of the party killing, are barbarous, proceeding rather from brutal malignity than human frailty; and barbarity will often imply malice." Law of Homicide, sec. 425, and cases cited.

Blackstone says: "Also, if, even upon a sudden provocation, one beats another in a cruel and unusual manner, so that he dies, though he did not intend his death, yet he is guilty of murder by express malice; that is, by an express evil design, the genuine sense of *malitia*. As when * * * a school master stamped on his scholar's belly, so that the sufferer died, this was justly held to be murder, because the correction being excessive, and such as could not proceed but from a bad heart, it was equivalent to a deliberate act of slaughter." 4 Bla. Com. 199.

Under these authorities and in the circumstances already stated, even if it be true that the old man replied to defendant's impertinent and insulting questions, "none of your d——n business," and shoved him and raised his hand as if to strike him, the subsequent atrociously malignant and barbarous conduct towards him, an aged and helpless cripple, establishes such a case as would have well warranted an inquiry by the petit jury, as to whether the defendant was not guilty of murder in the first degree, and it does not admit of doubt that their inquiry should have been confined to that degree. Of course there could be no manslaughter in either degree in the circumstances of this case, and that inquiry should not have been submitted to the jury.

II. Was an instruction authorized on the theory of self-defense? This is the remaining point to be considered. As shown by the statement heretofore

made, old man Thompson had no weapon, and consequently there was no overt act on his part.

The right of defendant again to attack his helpless victim did not arise, and could not arise, until he had done everything in his power to avoid doing so. If he could safely have avoided jumping on the prostrate form that lay bleeding before him, it was his duty to have done this, for otherwise he would not have been justified. *State v. Johnson*, 76 Mo. 121. The duty of defendant was to retreat, or at least to avoid proceeding to the last resort, to the exercise of the extreme right of self-defense, so long as was consistent with his own safety; and certainly there was no such fierceness of assault in this case as sometimes forbids retreat and justifies instantaneous action. *State v. Thompson*, 83 Mo. 257; 1 Wharton on Criminal Law [9 Ed.], sec. 486a; 1 Bishop's New Criminal Law, secs. 843, 844, 872.

Besides, one who claims to have acted in self-defense must act without fault or carelessness. 2 Bishop's Criminal Law, sec. 644. He cannot act on bare conjecture or surmise, and then claim he had reasonable ground for his acts and extreme necessity for his justification. In the present instance, defendant seemed all too eager for the attack, and jumped on the old man without even looking to see if he was getting or had a pistol. Moreover, that defendant was not acting in self-defense is shown by his conduct throughout the whole series of murderous assaults which he made, and by the final kick in the head, which he gave his decrepit and aged victim after he was pulled off of him the last time. These circumstances show a cruel and malignant heart, and not a reasonable apprehension of immediate and impending danger. *State v. Gilmore*, 95 Mo. 554; *State v. Tabor*, 95 Mo. 586.

For these reasons, we hold that there was no basis for an instruction on the theory of self-defense; indeed, on the facts presented by this record, it is glaringly preposterous to discuss the question. But, for reasons already given, as there was no error committed prejudicial to the defendant, the judgment must. be affirmed. All concur.