State v. Inks.

---

THE STATE v. INKS, *Appellant*.

Division Two, November 20, 1896.

1. **Criminal Practice**: MURDER: CONTINUANCE. It was not error to refuse a second continuance because the counsel appointed for defendant, who was indicted for murder, had not had time to prepare the defense, defendant, by reason of his poverty, having been unable to retain counsel, and it further appearing that he had been arraigned two months before and had failed to notify the court that he was without counsel or that the counsel who appeared for him when arraigned had abandoned his defense.

2. ————: INDICTMENT. Mere surplusage will not vitiate an indictment.

3. **Criminal Law**: MURDER: INDICTMENT. An indictment for murder in the first degree *held* sufficient against the objection that it did not charge that the assault was deliberately made.

4. **Criminal Practice**: MURDER IN FIRST DEGREE: INSTRUCTIONS. It is not reversible error to instruct that if the jury find defendant guilty of murder in the first degree "you will merely say so in your verdict. To the court belongs the duty and responsibility of affixing the punishment the law provides for the crime," as tending to encourage the jury to convict of murder in the first degree by relieving them of responsibility for defendant's death in case of such conviction.

5. ————: ————: ————: EXCEPTIONS. An instruction will not be reviewed on appeal where no exception has been saved thereto.

6. ————: ————: ————: MANSLAUGHTER. Where the evidence shows that defendant deliberately formed a design to entice deceased to defendant's home, and on his refusal to go shot him down in cold blood, an instruction on manslaughter is properly refused.

*Appeal from Holt Circuit Court.*—HON. C. A. ANTHONY, Judge.

AFFIRMED.

*H. S. Kelley, L. R. Knowles,* and *John H. Kennish* for appellant.

(1) The indictment is insufficient in not charging that the assault was deliberately made. (2) The court erred in overruling the application for a continuance. *State v. Anderson,* 96 Mo. 241; *State v. Wood,* 68 Mo. 444; *State v. Scott,* 44 Iowa, 93; *People v. Anderson,* 53 Mich. 60; *State v. Dakin,* 52 Iowa, 395; *State v. Hagan,* 22 Kan. 490; *Petit v. State,* 135 Ind. 393; *Howell v. State,* 5 Ga. 48; *Madox v. State,* 32 Ga. 581; *Polite v. State,* 78 Ga. 347. (3) The court erred in its eighth instruction in that it told the jury "if you find the defendant guilty of murder in the first degree you will merely say so in your verdict. To the court belongs the duty and responsibility of affixing the punishment the law provides for the crime." The clause referred to was unnecessary and operated to influence the jury to find the defendant guilty in that degree by relieving them of all responsibility for the defendant's death. (4) The court erred in refusing to instruct upon manslaughter, and in refusing to give the instructions on manslaughter in the third and fourth degrees requested by defendant. The court is the judge of the grades or degrees of homicide which the evidence tends to prove. *State v. Turlington,* 102 Mo. 642; *State v. Lewis,* 118 Mo. 79. (5) But when there is any evidence upon which to base an instruction, it is not the privilege of the court to pass upon its credibility, even though it may conflict with the physical facts. It is the sole province of the jury to determine whether the testimony of any witness is true or false, and what the facts may be in the given case. (6) Therefore, when the defendant testifies instructions predicated upon his evidence should be given. *State v. Talmage,* 107 Mo. 543; *State v. Brown,* 104 Mo. 365; *State v.*

*Palmer*, 88 Mo. 568; *State v. Banks*, 73 Mo. 592; *Nicholas v. Winfrey*, 79 Mo. 544. (7) And if the instructions asked be imperfect, and are for that reason refused, the court should give proper ones on the points intended to be submitted. *State v. Patrick*, 107 Mo. 147; *State v. Taylor*, 118 Mo. 153; *State v. Luke*, 104 Mo. 563.

*R. F. Walker*, attorney general, and *G. W. Murphy* for the state.

(1) The indictment in this case is sufficient. It clearly charges the crime of murder in the first degree and acquaints the defendant with the charge he is required to meet. It charges the assault, shooting, and killing of the deceased to have been done feloniously, willfully, deliberately, premeditatedly, and of his malice aforethought. *State v. Fairlamb*, 121 Mo. 127. (2) Objection is made in the motion for new trial and it is presumed will be urged in the briefs filed here to the instructions given upon the part of the state. This court will find upon reading the bill of exceptions that no exceptions were taken or complaint made at the time the state's instructions were given; this being true, the defendant will not be heard to complain. (3) It is also contended that the court failed to declare the law applicable to the case. It is sufficient to say that no exceptions were saved to the failure of the court to so instruct the jury. *State v. Nickens*, 122 Mo. 611; *State v. Paxton*, 126 Mo. 500; *State v. Nelson*, 33 S. W. Rep. 809. (4) The application of the defendant for a continuance was properly overruled. It in no way complied with the statute nor did it contain facts sufficient to warrant continuing the cause. (5) The court instructed the jury as to murder in the first degree, but properly declined to instruct the jury upon the law of self-defense and as to manslaughter in any of

the degrees. The testimony in this case showed conclusively the crime of murder in the first degree; nothing more and nothing less. The defendant's testimony, if taken and admitted to be true, would have warranted neither an instruction as to manslaughter or self-defense. The most it did or could do was to suggest the possibility of murder in the second degree. *State v. Fairlamb*, 121 Mo. 127; *State v. Kloss*, 117 Mo. 591.

GANTT, P. J.—The defendant was indicted on the twenty-seventh day of August, 1895, for murder in the first degree. He was duly arraigned on the twenty-ninth day of August, 1895, and on his application the cause was continued until October 28, 1895. On the twenty-ninth of October a second application for continuance was overruled and the jury ordered for November the fourth, at which last date the panel of forty was selected and the statutory time awarded to each side for challenges and on November 5 the panel of twelve was selected and the trial proceeded, resulting in a verdict for murder in the first degree. From that conviction this appeal is prosecuted.

The evidence developed the following facts:

The defendant and his wife and children during the winter of 1895 occupied a house in the town of Maitland which belonged to the deceased, John Patterson. In March, 1895, defendant and his family were ejected from the house in a landlord's action for failure to pay the rent. There was evidence that at the time his family were put out of the house defendant threatened to get even with deceased, but defendant and the constable testified to such a state of facts that this threat might have been directed to the constable alone. To the son of deceased, the defendant, about the same time, said: "See, isn't that a d—— shame, a

woman and children to be turned out like this?"
"This isn't the end of it; he'll pay d—— dear for it."

On the fifteenth day of May, 1895, John Patterson, the deceased, accompanied his wife to Mound City, at which point she was to take the train for Denver, Colorado. On their way to the railroad station they passed the defendant who stopped Patterson and said he wanted to speak to him, whereupon Patterson told him he was taking his wife to the train and had not time to see him then but would later. It further appears in the evidence that after defendant learned of the presence of Patterson in Mound City he attempted to hire a gun in Harvey's gun shop but failed. He then went to the hardware store of Parker & Harvey and was seen looking into a show case containing revolvers. After the shooting it was discovered that he had abstracted one of the revolvers and the pistol with which he shot Patterson was identified as the one he had thus surreptitiously taken from the show case. Defendant afterward in his own testimony confessed to have taken the revolver without the knowledge of the proprietors of the store. His explanation of why he got it is in these words: "Well after my wife told me what she did I was terribly worked up over it and knowing Mr. Patterson was a big man and rough I didn't know what he might do and I didn't carry it with any intention of killing him but to protect myself so I presented the gun to him if he didn't undertake to hurt me."

After arming himself with this revolver the defendant awaited the return of Patterson from the station, and a short time after the departure of the train he encountered him on the street near Whelty's store. They were seen to go into a saloon together in company with several others. They took a drink and according to defendant's testimony he paid for the

drinks though he says it was not his intention to pay for Patterson's. Coming out of the saloon the party separated, leaving Patterson, the deceased, and Inks, the defendant, alone. Soon after coming out of the saloon and while walking together defendant was heard by Mr. Dillon, a merchant, to say to deceased, "You'll have to settle that this morning." "You'll have to go down and settle that with her this morning." And then a few steps further, defendant said, "We'll settle it right here," at the same time drawing his revolver and placing it nearly in Patterson's face. Patterson endeavored to catch the revolver but defendant wrested it from his hands and fired, the ball passing through Patterson's heart. He walked a few steps, fell, and expired instantly. Whereupon defendant standing near the prostrate form of deceased said: "I told you I would do it and I have done it."

Another eyewitness of the tragedy, Mr. Martin, says he saw Inks, the defendant, and Patterson come out of the Racket store and walk down the street, Patterson slightly in advance of Inks. When they reached a point nearly opposite the saloon, Inks slapped Patterson on the shoulder and stopped him and said "By G—d we can settle it in less than a minute," and reached into his hip pocket and drew his revolver. Patterson stood looking at defendant perhaps ten seconds and attempted to grab the pistol with both hands but soon let loose and Inks drew his arm back and shot him.

Another witness, McKee, heard the defendant say when he surrendered the pistol to Mr. Moore after the shooting, "I am the man that done the killing and I am not sorry for it." To Mr. Parrish, one of the guards who took him to Oregon to jail, the defendant said, "I killed the man; if I hadn't I wouldn't have done what I intended to do." He further said to these

officers, "While he was marshal there they paid him a dollar for killing dogs and he did this (killing) with as good a grace as he did that." He said "he did it because he (Patterson) had insulted his wife and family.". He was not excited when he made these statements.

Mr. Cochran thought defendant placed the time of the alleged insult about three weeks before the killing. Mr. Alkin fixed the time of the insult from one to two months from a conversation with defendant in the county clerk's office the day after he was brought to Oregon. He asked him why he had not spoken to Patterson sooner and defendant answered he had seen him but Patterson had always avoided him.

The defendant gave the following version of the killing and the causes leading up to it: His wife had told him that morning at the breakfast table, about 7 o'clock, that Patterson had made an insulting proposition to her at Maitland. When he saw Patterson on his way to the train that morning, he accosted him and asked him if he was going away. He wanted to see him about what his wife had told him. He then went and got the revolver and when Patterson came up town from the station he met him near the saloon. He spoke to him and told him he wanted to see him and Patterson stood there a little bit and then started up the street, the defendant going with him. He says: "We walked along and one or two others." "We walked along till we got to the saloon and whoever the other gentlemen were went ahead and Patterson says, 'Let's go in and have a drink.' I told him I didn't care for any, though we walked in and while we was in there I asked Mr. Patterson what right—if my wife ever gave him any cause for him to insult her and talk and abuse her the way he had done to her; and I says to him 'I want you.' He denied it. And I says 'I want you to come

down to the house with me' and there was a few words passed between us and we turned around and walked out and he says 'I have to go up to the Racket,' and just then I talked to him.    I didn't want everybody to hear it.    Just then some fellow came along and stopped and shook hands with Mr. Patterson.    He was a stranger to me and we walked on up the street to the Racket store together and both went into the Racket.    I guess we were in there fifteen or twenty minutes.    We came out on the sidewalk and I says, 'Mr. Patterson, I want to know about this and I want you to come and go down to the house.'    He made some excuse; said he wasn't going, and we kept on.    He started off to walk down the street talking about it and I insisted on his going down to the house and when we got down about the saloon (a second time) I says, 'Mr. Patterson, I want this settled to-day,' and he says 'G—d d—n son of a bitch, get away, I'll knock the head off of you,' and he struck at me and I jumped back and throwed up my arms and he came on after me and I was excited and I just jerked my revolver and shot him.    That was all I know about it."

Upon this evidence the circuit court instructed the jury on murder in the first and second degrees and declined to instruct on manslaughter in the third or fourth degrees.

Various errors are assigned for a reversal of the sentence of the circuit court, all of which will be considered.

I.    One of the principal contentions of counsel in their oral argument was that the circuit court erroneously denied defendant a continuance.    It will be recalled that the homicide occurred on the fifteenth day of May—that defendant was indicted on the twenty-seventh day of August and on that day a copy of the indictment was served on defendant.    He was arraigned

on August 29, and by his counsel entered a plea of
"not guilty." The application for continuance, Octo-
ber 29, 1895, was based upon the claim that defendant
by reason of his poverty had not been enabled to retain
counsel for his defense; that those appointed for him
on October 28 by the court had not had time to prepare
his defense. It is true it also alleged that he had been
informed that there were material witnesses in the
neighborhood of Mound City which could be discov-
ered by the next term of the court. No names are
divulged nor any material fact to which they could tes-
tify, disclosed.

It is manifestly insufficient in this last respect.

While it was the duty of the court to give defend-
ant reasonable time to prepare his defense and appoint
him counsel if he was not able to employ any, when it
is considered that defendant, though in jail on a charge
of homicide from May 15, at no time requested the
court to provide him with counsel, and when arraigned
on August 29 was attended and represented by the
same learned counsel who defended him on the circuit
and who argued this appeal in this court, it can not
be said the court acted unwisely or harshly. If the
defendant knew he had no counsel he should have
notified the court when arraigned and if the counsel
who then appeared for him intended to abandon the
defense after that time or was only appearing in a
friendly capacity the court should have been so advised.
A party charged with a grave offense is no more privi-
leged to trifle with the reasonable administration of
justice than any other litigant. The delay in appoint-
ing counsel was the result of defendant's own refusal
to advise the court of his condition and was a matter
largely within the discretion of the trial court, and we
have been unable to discover wherein he has suffered
from lack of counsel. Certainly the three attorneys

who represented him in this court have shown no want of zeal or ability in his behalf.    There was no error in refusing the continuance under the circumstances.

II.    The indictment is next challenged.    The specific objection to the indictment is that it fails to charge that the assault was *deliberately* made.

The pleader was unfortunate in redundancy and surplusage.    While it is true he omits the word "deliberately" as a precedent modifier of the verb "make" in charging the assault, the assault is charged in the words following to have been done "*feloniously, on purpose, and his malice aforethought, willfully, deliberately, and premeditatedly.*"    So that while the pleader was most careless in omitting to precede the description of the assault with the adverb "deliberately," yet by his continuation of those modifiers subsequently, he did sufficiently though awkwardly charge the assault to have been deliberate.

Having averred then the assault to have been feloniously, premeditatedly, and deliberately made, other redundant allegations may be stricken out and *a sufficient averment of a mortal striking remains* connected by the copulatives "and then and there" with the words "feloniously, deliberately," etc., already alleged.    To thus rid an indictment of surplusage was permitted at the common law although "great strictnesses have at all times been required" even to "such a degree as to become the disease and reproach of the law."    Thus Chitty, in his Criminal Law (vol. 1, p. 173) says:    "But though the indictment must in all respects be *certain*, yet the introduction of averments although superfluous and immaterial, will seldom prejudice.    For if the indictment can be supported without the words which are bad, *they may on arrest of judgment be rejected as surplusage.*"    This statement of the law was approved and followed by this court in *State v.*

*Meyers*, 99 Mo. 107. See, also, 1 East, P. C., 346; 2 Hale's P. C., 184, 185, par. VII. This objection must also be ruled adversely to the defendant.

III. A criticism is made of the eighth instruction given by the court of its own motion. That instruction is in these words:

"If you find the defendant guilty of murder in the first degree you will merely say so in your verdict. To the court belongs the duty and responsibility of affixing the punishment the law provides for the crime."

It is objected that the latter clause had a tendency to encourage the jury to find the defendant guilty in that degree by relieving them of all responsibility for the death of the defendant.

It might perhaps be sufficient to say that in the present case no exception whatever was taken or saved to the giving of this instruction, and hence the point is not available in this court; but lest such a ruling may be considered an implied assent that had an exception been saved the instruction would be declared error we have examined the point.

The law prescribes that the punishment of murder in the first degree shall be death by hanging. R. S. 1889, secs. 3461 and 4257. By section 4229 it is provided that in all cases of a verdict of conviction for any offense where by law there is any alternative or discretion in regard to the kind or extent of punishment to be inflicted the jury may assess and declare the punishment in their verdict and the court shall render a judgment according to such verdict except as therein provided.

Now there is no alternative whatever as to the punishment of murder in the first degree, and the jury has no discretion to assess a punishment therefor, hence the duty of assessing the punishment is not left to them. The jury is required in a case of murder,

when there is evidence from which they may find it to be in the first or second degree, to find the degree.   If they find it to be in the first degree, the law fixes the punishment and the court imposes it.   If the second degree they must assess the punishment.

Every juror knows, if he is at all competent to sit, that, if he finds a defendant guilty of murder in the first degree, the punishment is death—as inevitably as if the law required at his hands the meaningless form of assessing a punishment which he is powerless to vary.   How then can it be said he is invited to render such a verdict because he is told that the law, not he, assesses the punishment?   Ordinarily it is true the courts have contented themselves with the formula "if you find the defendant guilty of murder in the first degree you will simply so state in your verdict" saying nothing as to the duty of the court to affix the punishment, but there are many cases in which the present formula is used; but in either case the verdict is the same.   *State v. Avery*, 113 Mo. 475.

The objection smacks of the squeamishness that presupposes an ordinary jury has not common intelligence and can not be told a simple legal conclusion known of all men without misleading them.   When juries are composed of such material some other method of enforcing criminal law must be adopted.   There was no error in the instruction as given.

IV.   The twelfth instruction is also assailed.   No exception was taken or saved to the giving of this instruction and it can not afford ground for a reversal. We may remark that the instruction approved in *State v. Wisdom*, 119 Mo. 539, is the better form of instructing upon the credibility to be given statements proven to have been made by defendant.   *State v. Carlisle*, 57 Mo. 102.

V. By far the most serious question in the case is the refusal of the circuit court to instruct on manslaughter in the fourth degree.

Manslaughter in the third degree is wholly out of the case. There was not even in the defendant's own evidence the slightest ground for submitting to the jury the issue that the defendant did not design to affect the death of Patterson. A man can not deliberately seek a difficulty with another and then aim and fire a revolver at him and when he has thus slain his victim say he did not design to kill him.

Was there, however, evidence upon which the court was required to instruct on manslaughter in the fourth degree? If there was, it must be found in defendant's evidence when testifying in his own behalf.

Leaving that evidence out of the discussion for the present, the other evidence without contradiction or conflict shows that the defendant had a grievance or grudge against the deceased because deceased had sued him and by the process of the law ejected him from a house the defendant had rented from deceased and failed to pay the rent. He had threatened that day that deceased should pay dearly for dispossessing him. Some two months had elapsed. In the meantime defendant's wife had told him deceased had made an insulting proposition to her. He had seen deceased several times. The deceased came with his wife to the railroad station. On his way to the station the defendant's son first told him his father desired to see him. Then defendant called to him to know if he was going away and was assured by deceased he was not but was simply going to the train to see his wife off. Thereupon defendant immediately proceeds to procure and arm himself with a deadly weapon, a revolver, even obtaining the pistol by stealth. He then posts him-

self on the street to await the return of the deceased from the station. Soon after Mr. Patterson returned to the business portion of the town defendant was seen to associate himself with him. He exhibited no signs of passion or excitement. He went into a saloon and drank with him; came out and accompanied him up the street to another store where Patterson had business; remained until Patterson was through and was then seen to walk down the street with him. About this time he was overheard saying to Patterson "You'll have to settle that this morning." "You'll have to settle that with her this morning," and then, "We'll settle it right here," and immediately drawing his pistol, he thrusts it into Patterson's face. Patterson endeavored to catch the pistol and failing defendant shot and killed him.

In all this evidence there is not a word showing the slightest provocation which could reduce this killing to manslaughter, neither is there a word showing any passion. Does defendant's evidence supply the provocation?

He corroborates the state's witnesses as to his seeing Patterson on his way to the station; as to his hailing him and learning he was not going to leave town; as to his immediately going up town and surreptitiously procuring a revolver from the hardware store of Parker & Harvey and loading and arming himself with it; as to waiting for Patterson's return and purposely attaching himself to him and following him into the saloon and to the Racket store and waiting for him and then beginning the conversation as to Patterson's insulting his wife and the demand that Patterson should go to see his wife and settle the matter that day and Patterson's refusal; but he says that Patterson called him an opprobrious name and struck at him with his

hand, telling him to go away and thereupon he drew his revolver and killed him.

In short, out of his own mouth defendant confesses to having prepared himself for anticipated trouble which he proposed to provoke either for the old grudge on account of his ejection from the leased house or for the insult to his wife which he had nurtured for a month or more without resenting. He admits that he met Patterson in an apparently friendly manner, took a social drink with him and followed him from store to store in order to get a favorable opportunity of telling him he had learned of his insulting his wife. At last he makes the charge which Patterson instantly denies. Thereupon defendant demands that Patterson shall go to his home and settle it with his wife and Patterson prudently refuses again.

Granted that Patterson, annoyed at the persistence of defendant, did curse him and tell him to get away and threw out his hand at him, can it be said this slight provocation, brought about and incited by the persistent charge of an unlawful act, justified defendant in deliberately shooting down an unarmed man? Clearly not. He nowhere says he shot the deceased in the heat of passion aroused by the opprobrious epithet or the attempted blow, but he says himself "I shot him because he insulted my wife and family." *State v. Kloss*, 117 Mo. 591; 2 Bish. New Crim. Law, sec. 703; 1 East, P. C. 234. On the contrary the whole evidence shows a deliberately formed design to entrap Patterson into the home of defendant and then and there murder him. When his victim declined to be led into the trap he persistently plied his démands and shot him down in cold blood and boasted of his murderous achievement. There was no manslaughter in the case. The court was too lenient in instructing for murder in the second degree even. The case was one

of premeditated, deliberate murder in the first degree as the jury very properly found.

There are a number of other imaginary errors discussed in the brief which are wholly unsupported by the record.

We have given the whole record a careful examination and find no reversible error therein and the judgment of the circuit court must be and is affirmed and the sentence of the law is directed to be executed. SHERWOOD and BURGESS, JJ., concur.