THE STATE v. BAKER, *Appellant.*

Division Two, December 6, 1898.

1. **Murder:** INSTRUCTION FOR MURDER IN SECOND DEGREE. Unless the evidence justifies a verdict for murder in the second degree, the trial court should not instruct for that degree. The evidence in this case is reviewed at length and it is held that it does not show murder in the second degree, but murder in the first degree, and therefore the instruction for murder in the second degree was properly refused.

2. ———: ———: BLOW BY DECEASED. To rebut the overwhelming evidence that defendant had horribly and extensively beat his wife with a murderous club, he introduced evidence to show that he merely struck her one blow with his fist in a heat of passion because she gave him a swat with a wash rag she held in her hand. *Held*, that such a blow under such circumstances would not reduce the crime to manslaughter or any grade lower than murder in the first degree.

*Appeal from Shannon Circuit Court.*—HON. W. N. EVANS, Judge.

AFFIRMED.

*Orchard & Saye* for appellant.

(1) The court should have given an instruction for murder in the second degree in view of the defendant's testimony. *State v. Wiener,* 66 Mo. 13; *State v. Robinson,* 73 Mo. 306; *State v. Curtis,* 70 Mo. 599; *State v. Ellis,* 74 Mo. 207; *State v. Lewis,* 74 Mo. 222; *State v. Kotovsky,* 74 Mo. 247; *State v. Ross,* 14 Mo. App. 567; *State v. Banks,* 73 Mo. 591; *State v. Harris,* 76 Mo. 363; *State v. Berkley,* 109 Mo. 673. The defendant under the evidence was entitled to an instruction for manslaughter in the third degree under Revised Statutes 1889, section 3471, and an instruction for manslaughter in the fourth degree under Revised

Statutes 1889, section 3476.   In a prosecution for murder where the instructions given on behalf of defendant, based upon his own testimony, allow a finding for a less grade of homicide, it is reversible error to, fail to define such lower grade.   *State v. Wilson*, 85 Mo. 134. (2) The expression "heat of passion" should not be used in instructions without explaining its technical meaning.   *State v. Andrews*, 76 Mo. 101.

*Edward C. Crow*, Attorney-General, *Sam B. Jeffries*, Assistant Attorney-General, and *W. W. Graves* for the State.

(1)   There can be no question that the brutal acts disclosed by the evidence fully sustains the court in giving instructions for murder in the first degree, and fully sustains the verdict of the jury.   *State v. Brown*, 119 Mo. 527; *State v. Kloss*, 117 Mo. 591.   (2) The instructions given fully and fairly declare the law under the evidence in this case, as to murder in the first degree and manslaughter in the second degree.   So that, if it be true that appellant's refused instructions did properly declare the law, no error has been committed by the court.   The only question involved in the refused instructions is the one pertaining to murder in the second degree, and we contend that the court committed no error in refusing to instruct for murder in the second degree under this evidence.   The brutality of the act, as shown by the evidence, would have made it farcical for the court to have instructed for murder in the second degree, and we think the court was in error when an instruction was given for manslaughter in the second degree.   Of this error, however, the defendant can not complain.   *State v. Brown*, 119 Mo. 527; *State v. Kloss*, 117 Mo. 591; *State v. Bell*, 136 Mo. 120; *State v. Duestrow*, 137 Mo. 44.

GANTT, P. J.—The defendant was indicted at the March adjourned term of the circuit court of Shannon county, for the murder of his wife, Annie Baker, at the town of Winona, in Shannon county, on the twenty-second day of March, 1898.

He was duly arraigned at said term and his case continued until June 27, 1898. On June 27, he applied for a change of venue, which, upon a hearing, was refused. He was put upon his trial and convicted of murder in the first degree. His motion for new trial having been overruled, he appeals to this court.

I. Considering the assignments of error in the order of the brief of counsel for defendant, it is first urged that the court erred in refusing three instructions asked by defendant.

These instructions consisted of an instruction defining murder in the first degree, and the words "deliberately," "premeditatedly" and "malice aforethought," and advising and informing the jury that they must find all these elements in order to convict the defendant of murder in the first degree, and although the jury might believe from the evidence beyond a reasonable doubt that the defendant without justifiable cause or legal excuse killed the deceased, still if they entertained a reasonable doubt whether the killing was unlawful, deliberate or premeditated, or whether the fatal blow was struck with deliberate intent that the blow should take the life of deceased, then the jury should find defendant guilty of murder in the second degree. In a word, defendant asked an instruction for murder in the second degree. He did not request an instruction on manslaughter in any degree, nor did he pray the court to instruct on all the law of the case. The learned circuit court did instruct on murder in the first degree and manslaughter in the second degree. The court instructed clearly and fully

upon reasonable doubt, the presumption of innocence, the effect of statements made by the deceased, his right to testify. These instructions were amply sufficient and have often received the approval of this court, and it is clear that no error occurred unless it was in refusing an instruction for murder in the second degree.

This court long ago decided that unless the evidence justified a verdict for murder in the second degree, the trial courts should not instruct for that degree, and have since adhered to that ruling. *State v. Hopper*, 71 Mo. 425.

We must then look to the evidence to determine this exception.

The testimony discloses that the defendant Oscar H. Baker and his wife, Annie, lived in the town of Winona, a station on the Current River railroad in Shannon county in this State. On the night of March 21, 1898, these two went into a private office of Lee's saloon in Winona and drank together, leaving the saloon early in the evening, and going home about 9 o'clock. The evidence tends very strongly to show they had frequent brawls previous to this night.

The night watch of the town testified he saw them twice that night, first when they went to the saloon and returned home, and next about 1 o'clock that night. He details what occurred in this way:

Baker called me and said he wanted me to go down to his house, and I asked him what for, and he said, "*We have had hell down there*, and that God damn bladder of mine is drunk again, and I want you to go down and look at her." I told him to go home and go to bed; and he said, "No, I want you to go down and look at her; *I am going to leave here between this and 2 o'clock, and I want you to go down and see her and see that she is not dead, and then I am going;* they can't *blame this to me if she be found dead, can they?*" I

again told him to go home and go to bed, and he said, "No, sir, I ask this as a favor, I want you to go." I looked at the clock at Bolin's and it was just 1 o'clock and I went down with him; when he got to the gate he says, "Tie the bull dog." I had the bull dog with me; I looped the rope over the post and went in to the door, and he says, "Go in Pap;" and I says, "No, you go in first and I wont be afraid; I will come in then," and Baker walked in; when I got in he says, "Now Pap look around and see what you can see." I didn't see anything at first but furniture, but after looking around a little bit I saw Mrs. Baker on the bed; the left-hand front of the bed was broke down; smashed down from the head post, and some of the slats down, too, but I noticed the form of a person lying in that hole like; lying on the right side with the feet drawn up that way (indicating). The woman, she was short and heavy, not very tall, she was lying in that, covered up with a calico skirt, I think it was; I had seen Mrs. Baker wear it many a time, a dark calico skirt. Baker says, "See what you can see there." I walked up and listened, I could not see anything only she was covered up there, but I could hear her breathing, and by him telling me she was drunk and the way she was breathing, I thought probably she was, I didn't know any different; she was breathing heavy like, that way (indicating), so I just looked at her. Baker says, "What do you see, Pap?" and I says, "I see Mrs. Baker or some person lying there," and he just got up and walked over to the head of the bed and stepped back a little; he took the cover off her face and tapped her face with his right hand and says, "Ann, Pap Jones is here," and she says, "I don't care," and he says, "You don't, hey?" and she says, "No;" he says, "Look at her, Pap," and I just walked up and looked and her

face was red and flushed, but I didn't notice any marks of violence on it or anything like that, and he says, "Now, what do you see there?" and I says, "I see Mrs. Baker, that's all," and he went and covered her up and turned around and walked out; he called to me and I stopped at the gate and he came out and said, "Now, Pap, I am going to leave here; my satchel is already packed," and there was a satchel set right by the door packed. "If she be found dead after I am gone they can't blame it on me, can they?" And I says, "I don't know about that; don't know why they would blame you after you had gone away from here," and I says, "I am going up town." I saw no more of Baker that night. Next morning Baker came to my house; he said, "Hello, Pap," and I said, "Good morning, Mr. Baker;" he said, *"There ain't nobody dead yet, but there ought to be;"* he says, "I hain't got no more wife than a 'Haunt' this morning;" I says, "Where is she?" and he says, "She fired me out," and my wife says, "Can't I get you some breakfast?" and he says, "No, we have had breakfast, *but I hain't got no wife;* wouldn't that kill you?" Baker then went towards home and I went to the shop.

Mrs. Joseph Miller testified:

I lived at Winona and was living there in March, 1898; I live between fifteen and seventeen feet of where the defendant, Baker, lived; I saw Baker on Monday morning, the twenty-first of March, and I saw him there at the place Monday evening; the first I recollect Monday Mr. Baker took Mrs. Baker and started to town with her; they were talking as they went along; they came back about 9 o'clock; Baker was talking very loud like he might be angry with her; Mrs. Baker was not saying anything at all; during the night I heard a noise in the house like there was something being thrown; I heard this noise at different times;

could not say how many. I saw Baker come back there from town and go in the house; he went in at the front door; he opened the door and went in, and shut the door after him; some of the windows had blinds up that day; I heard Mrs. Baker say, "Oscar, quit, don't hit me any more;" then she called Mr. Miller, and said, "Oh Joe, oh Joe, oh Joe;" then she said, "Oscar, don't hit me any more," "Oscar, don't hit me any more;" I could hear the licks he struck her; I never saw Mrs. Baker after she started down town with Baker until after she was killed; she was at my house, and was in good health, so far as I know; there were no wounds or bruises on her then; Mrs. Green and Mrs. Embeck were present when I heard these licks, and Mrs. Baker hollowing "Oh." The first time I heard her speak Mr. Baker's name she spoke it very loud, the second time she called Mr. Miller it was low, and the next time she called Mr. Miller it was weak, and the next time I heard her speak it was just kind of a moan.

J. D. Rutledge, city marshal, testified that he and the deputy sheriff, Mr. Reary went to the house of defendant about 1 o'clock of March 22, 1898. He says, "I went on down and went in the front door and turned to the left hand room and didn't find him. I was going to the partition door again when I heard him speak; he says, "Are you dead, Ann, are you dead?" Reary spoke and says he is in that little side room. I went to the door and he said, "Is that you Mrs. Miller?" I said, "No, it is me," and he says, "Don't come in here," and I said "I don't want to come in, you come out." He opened the door, and as he opened the door the door came back against me, and as he came out I peeped in and saw the woman lying with her head to the door; he stepped out over her as he came out; she

was lying there naked, still there was a little·clothes here (indicating); I told him to consider himself under arrest; and he says "all right;" I wanted to hurry him out of the house, and he says, "Don't be in any hurry;" he went out the door and then called for his coat and we went back and got his coat and took him to the jail and locked him up; while we were on the road up there *he told us not to go back to the house for three or four hours;* he said, "*We were all on a hell of of a drunk, but everything will be all right then.*" I got four or five men and went back there and found the woman dead on the floor, lying about where she was when I first went there; she was lying on her back with her head to the door and her feet upon a small bed, on the railing; one end of the railing was broke down; her head was within a foot of the door that he came out of; she had on two skirts and an old black calico dress with the arms tore off. In the front room where we first went in was a large bed, and the slats had been broken down in the middle, and there was the bed clothes on there and two pillows, and it was all covered with blood. There was a stick of wood lying on the bed and there was a butcher knife sticking in the wall, and there was some other furniture in the house. There was blood all over the walls and all over the room and on the door knobs and all over the casings and the window blinds; one of the window blinds had been broke down; looked like it had been out up there with a little flange here (indicating) and a stick of wood on it and there was bloody prints, finger prints, where he he had held up the blind; the stick of wood I found on the bed was perhaps two and a half or three inches square and sixteen or seventeen inches long; there was blood on one side of it, I think; there was blood on it somewhere. Mrs. Baker was bruised in several places. All over her legs there were small bruises in

different places, one place looked like there might have been a knife stuck in it. Her nose was all mashed; there was a great big cut place over her ear; her eyes were all black and she looked like she might have been beat up considerably, and her neck was all black; and she looked like she had been struck a heavy lick across the full length of her breast; she was all beat up on her body and legs and arms plumb down to her feet. I touched the body when I went back with these men and it was just a little bit warm. We looked at the bed in the other room, the bed in the back room; there were small pillows on it; these pillows were soaked with blood; just as bloody as they could be. It was a matress that was on the bed; the bed was broke down in the middle and at the head there was blood, and it looked like it had run down in the middle of the bed where the low place would be in the bed. Baker was in the room where the body was when I first found him; he had on one of these big heavy blue or black shirts; on the breast of the shirt it looked bloody as though it had been washed off, and the pants he had on had been washed off too, they were wet to the knees; and as he stepped out of the door I took hold of his hands, they were wet and damp; I found when I went back after putting Baker in jail, a pan sitting there about half full of water and a rag in it; the water was bloody, pretty near looked like blood; it looked as though the blood had been washed up a little off the bed; looked as though there had been water thrown on it; the rag in the pan of water was all bloody. (Here the witness identifies the sheet that was on the front room bed, and a blanket that was on the front room bed, and the dress that was on the deceased, and a window curtain, and a skirt that was on the deceased, and a knife that was sticking in the wall, and a steel that was lying on the floor; and the piece of wood that was lying on the

bed, and the pillows on the bed, and the shirt that Baker had on). The witness then continues. This was in Shannon county, State of Missouri, in 1898. About 9 or 10 o'clock in the morning before I arrested Baker, he came to the barn and asked if he could get a hack and I told him that he could. He said, "I want it four or five days, I am going to Springfield to see some of my folks, can I get it that long?" I said, "Yes, you can get it." He kind of turned around and says, "By God, can I get it any time I want it?" I said, "Yes, you can get it any time you want it." He says, "I don't want a buggy, I want a hack." He looked back and saw a little hack and says: "That will do, I have my own team." He spoke to me probably a week or two before that and said he might want to take a trip to Springfield, and that he might trade his wagon for a hack, or hire it or some other way; I told him trade, hire or any way.

Mr. Reary corroborated this statement of the marshal, and says as they were taking defendant to the calaboose he asked him if anything serious had occurred at the house, and the prisoner said "No." Fifteen minutes later they went down and found Mrs. Baker dead, and all the furniture covered with blood.

Dr. A. L. McCurdy testified:

I live at Birchtree. I am coroner of the county. I held an examination over the body of Mrs. Baker, March 22, 1898, at Winona. The fatal wounds were on the head; there was a cut on the skull here (indicating) about two inches long; above here on the left side the skull was fractured; and it was fractured here (indicating); her nose was broken and she had some bruises on her body. Those fractures of the skull would produce death. There might have been a fracture at the base of the skull, but I could not tell. Her hands were badly bruised, they were black; there was one cut

up here on her head and the others were bruises; this cut on the left hand side of the head was done with a sharp instrument, I should suppose with a knife; the fracture must have been done with some heavy instrument. She could not have been dead long when I saw her, as there were no signs of decomposition at that time; it was between 4 and 5 o'clock when I arrived there and I supposed she had been dead some few hours. Everything around the place was bloody.

From the foregoing and other corroborating evidence, it is clear beyond a reasonable doubt that defendant in the most brutal and fiendish manner, murdered his wife. In view of his previous preparations for flight to Springfield, of his threats to leave her that day, his suggestive inquiries as to whether they could blame him if she was found dead, her piteous appeals to him not to strike her any more; the medical evidence as to the deadly character of the wounds inflicted on her person, and the bloody cudgel found by her corpse, all attest one of the most diabolical and malignant murders to be found in the annals of crime.

That one bearing the semblance of a man should have been so brutal, is almost inconceivable. If barbarity will ever supply the evidence of malice, surely this must be the case. *State v. Kloss*, 117 Mo. 591.

It is argued that this is murder in the second degree. We hold otherwise. The evidence to rebut all this testimony was that he merely struck his wife one blow with his fist in a heat of passion because she gave him a swat with a wash rag she had in her hand. Such a blow under such circumstances would not reduce the crime to manslaughter or any grade lower than murder in the first degree. *State v. Kloss, supra; Com. v. Mosler*, 4 Penn. St. 264; 2 Bish. New Crim. Law, sec. 703. But the other evidence shows beyond peradventure that this evidence was false in every material particular. No

one blow could have produced the innumerable bruises all over his wife's body, nor could his fist have produced the incised wound on her head, or nose. Neither does he controvert the evidence of his murderous blows heard by Mrs. Miller and others. The testimony shows that he beat her with a club until the whole premises reeked with her blood.

The imagination can hardly conceive of a husband reveling in his murderous assaults upon a helpless wife as she pleaded with him for mercy, until her voice died away in a moan. If these facts do not furnish circumstances, which added to the intentional killing with a weapon, stamp it as a willful, premeditated and deliberate murder, then such a grade of homicide has no place in our criminal code.

The circuit court correctly ruled it was murder in the first degree.

We hold there was no manslaughter in the case, but no harm resulted to defendant in giving the instruction on manslaughter in the second degree.

II. There was no error in denying the change of venue. The State's evidence rebutted the idea of such prejudice as would prevent a fair and impartial trial.

After a careful reading of every line of this record, we are painfully impressed with the brutality and guilt of defendant, and the judgment is accordingly affirmed, and the sentence of the law will be executed. SHERWOOD and BURGESS, JJ., concur.