THE STATE v. FRANK VEST, Appellant.

**Division Two, January 6, 1914.**

1. **HOMICIDE: Manslaughter: Assault on Defendant's Wife: Evidence.** Where the evidence in a prosecution for murder, when most liberally construed in that respect, tends to show only that the defendant came home in the evening and was told by his wife that the deceased had, a few minutes before, "come out in his night clothes and tried to force her into his bedroom," but she escaped, and thereupon the defendant went to the deceased's room, where he found him in bed, and shot him, there is no issue of manslaughter to be given to the jury, especially in view of the fact that defendant's testimony does not show that he shot in a frenzy, but that he ordered deceased out of his house, and shot him, as he says, because deceased was in the act of shooting him.

2. ————: **Evidence: Dying Declarations.** Statements made when all hope of life had been abandoned, are admissible as dying declarations, and their admissibility is not destroyed by the fact that the next morning the declarant expressed a feeling that he might live if blood poison did not set in.

State v. Vest.

Appeal from Holt Circuit Court.—*Hon. William C. Ellison*, Judge.

AFFIRMED.

*W. A. Blagg, C. R. Ellison, J. S. Shinnabarger, Stokes & Stokes,* and *R. L. Minton* for appellant.

*John T. Barker,* Attorney-General, and *W. M. Fitch,* Assistant Attorney-General, for the State.

ROY, C.—Under a prosecution for murder in the first degree, defendant was convicted of murder in the second degree and his punishment as-
**Murder.** sessed by the jury at ten years in the penitentiary. He is a farmer, twenty-six years of age, living on a farm where he was born and has lived continuously. At the time of the tragedy he had been married about four years. He had one child about two years old. The wife and boy had both been sick, and were convalescent; the wife being able to do part of the housework. She was assisted by Pearl Barker, a girl of about twenty years of age, who had been reared in the neighborhood and who had been with this family for about five weeks.

Guy Stanley, the deceased, was a young man, "big and strong," who had been employed on the farm for several months; he had been reared in the community. He was addicted to excessive drinking. The defendant used intoxicants, but the evidence does not show that he became intoxicated. The defendant and the deceased were congenial, going out together on trips to town.

The killing occurred on Sunday, December 3, 1911, at about seven-thirty in the evening.

Glenn Burge, a sixteen-year-old boy and cousin of the defendant, testified that in watermelon time prior to the killing, Stanley told him in language not proper

to quote here, that he was going to have sexual intercourse with the wife of the defendant, and that, if the defendant came in, there would be a shooting match; and that the deceased made a similar statement in the potato patch when they were digging potatoes; and also testified that the deceased was in the habit of carrying a revolver.

Bert Stewart testified that about a week before the killing he was going to town with the deceased in a buggy and that he told Stanley that if he was bothering Mrs. Vest any he had better go away from there or he would get his head shot off; and that Stanley fired five shots from his revolver and said that was a game two men could play at. There was evidence tending to impeach the reputation of this witness. Neither of those witnesses told anyone about what the deceased told them until after the killing.

Glenn Burge and Pearl Barker testified that on Friday evening, before the killing, in the absence of defendant, in the kitchen of the Vest home, and while Mrs. Vest was in the adjoining room, Stanley came in intoxicated, having a pistol, indulged in vulgar talk, said that he could have sexual intercourse with Pearl Barker, and made other offensive statements. The evidence tended to show that this language of the deceased was overheard by Mrs. Vest. The evidence does not show where either the defendant or Stanley stayed all night that night. After the scene in the kitchen, Stanley left, and Mrs. Vest testified that Pearl Barker took charge of the pistol. On Saturday, the defendant and Stanley drove together to the town of Craig, returning about ten o'clock that night. Mrs. Vest and Pearl Barker testified that Stanley was drunk and came into the room where they were in bed together, while the defendant was in the kitchen, and that he lay down across the foot of their bed and pinched their limbs. They made him get up and told him to go to bed. He got up, but lay down on the floor

in their room; and the defendant had some difficulty in getting him to bed in the adjoining room.

About nine o'clock Sunday morning, the defendant and Stanley left home afoot to go to Bigelow, about three miles distant. Stanley returned to dinner. The defendant took dinner at the home of Ed Burge, his uncle, about three-quarters of a mile distant. There were several visitors at the Vest home that Sunday afternoon, including a neighbor, Mrs. Smith. There was some card playing, and the time appeared to be pleasantly spent as to all parties concerned, including Mrs. Vest, Pearl Barker and Stanley. Mrs. Vest and Pearl Barker testified that during the afternoon Stanley in a jocular way spoke of having pinched them the night before, and that he acted like he was going to pinch Mrs. Smith; that she said for him to behave himself, saying that she was too old a lady for him to be fooling around. About six o'clock everyone left the Vest home, except Mrs. Vest, the baby and Stanley. Just after dinner that day, the defendant, his uncle and Lester Burge, his cousin, drove across the river to Fargo, Nebraska, and were about twenty minutes in a saloon where they drank a beer.

Lester Burge testified that they got back from Fargo and he took Vest in a buggy to Vest's home, letting him out at the gate about one-eighth of a mile from defendant's house, about seven o'clock. That as they parted, defendant in a jocular way said, "I have blood in my eye."

Alex Cunningham testified that he heard the defendant make the same statement while on the road that night. After leaving the defendant at his farm gate, Lester Burge drove back home and was putting up his horse when a phone message was received at the Burge home from Vest, calling them down to the Vest home. Just at that time Pearl Barker and Lee Blevins, who had gone to church together, in a buggy, finding there were no church services, reached the

Burge home. They and Mr. and Mrs. Burge drove hastily in the same buggy to the home of the defendant. Defendant was at the yard gate, about thirty feet from the house, with a magazine shotgun in his hand. They found deceased lying on the floor of his bedroom, in great agony. He was placed on the bed. The defendant had telephoned for a doctor and for the deputy sheriff to bring the coroner. Dr. Hogan reached there about eight o'clock. He testified that he found two or three gunshot wounds in the back about the seventh rib, on the right of the spine and two or three inches apart, both indicating that the discharge of shot had gone straight into the lungs. There was another wound in the middle third of the left arm, and indications that the shot were ·in the flesh of the shoulder. All the wounds were about the size of a silver dollar, and were made by a shotgun. He saw the bedclothes lying on the bed; one of the bed covers was white; there were holes through the bedclothes corresponding to the wound on the body. Dr. Hogan stated that the white bedcover was powder stained, and another witness testified that the holes in the bedcovers were nearer one end than the other. The doctor stated that a few minutes after he arrived Stanley told him that he had been shot to death. Morphine and atrophine were administered hypodermically to relieve his sufferings. The doctor testified that from about an hour after being given the medicine the sufferer would be at times unconscious, but, when roused and asked a question, would come to himself and seem to speak in a rational way; and that his condition remained such until sometime next forenoon. Several witnesses testified to the same effect. The next morning he stated that if blood poison did not set up and they would take good care of him he would get well.

The witness Adams testified that he got to Stanley's bedside early in the night and asked him if he

realized his condition, to which Stanley answered that he was "shot all to hell." Witness said to him, "Guy, they tell me you can't live but a little while," to which Stanley answered, "I hate to quit in the middle of the game." During the night he said that he was "about all in," and said to his brother and sister that they would soon have no brother.

Tom Bridgeman said to him, "Guy, what was the trouble between you and Frank?" He said, "There wasn't any trouble." Then he asked about insulting his wife, and Guy said, "Nothing more than pinched her leg."

Adams further testified that Bridgeman asked Stanley how Frank came to shoot him and he said, "Frank came to the door and says, 'Guy, I am going to shoot you,' or 'kill you,'" and that he, Stanley, answered, "I wouldn't do that." At another time, deceased said that he answered-defendant by saying, "Help yourself, go to it." Stanley stated that the defendant then opened up the pump-gun on him. Tom Bridgeman's testimony was to the same effect. Bridgeman further testified that the deceased said, "I was lying on my right side with my back to the door and I was about half asleep and had been in bed but a short time."

Mrs. Vest testified that just after six o'clock on Sunday evening after the others had been gone awhile, she was putting the baby to sleep and the following occurred:

"While I was trying to put him to bed, Mr. Stanley took off his hat and coat and went into his bed room, and I thought he was going to bed. In a few minutes, he came out in his night clothes, and tried to force me into his bed room, and I told him to go away, and I called him a dirty dog, and I told him to tend to his own business, or I would tell my husband when he came home. He said he didn't give a God damn for him.

"Q. And what did he do then? A. Took hold of me, and grabbed me, like he was going to force me into his bed room, and I got away and ran out the south kitchen door, and went around to the front gate.

"Q. Pretty soon after that, whom did you see coming? A. My husband.

"Q. Tell the court and jury, in your own way, Mrs. Vest, what Frank did or what you said to him when he came up to you? A. He asked me what the matter was, and I told him that Guy had come out in his night clothes and tried to force me into his bedroom, and then he asked me where he was, and I told him he was in the house, and we came on in the house together."

She also testified that she then told her husband about the conduct of Stanley on Friday and Saturday nights preceding. She stated that her husband was mad, crazy mad, and terribly excited after hearing what she had told him. The defendant testified that he got home about six-thirty and found his wife at the front yard gate crying, and that she told him that just a few minutes before he came home Stanley had come into her room in his night clothes and had grabbed her and was going to force her into his bed room and she told him to go away and then he grabbed her and was going to take her in there, and also told him how he had acted on Friday night and Saturday night before and that she said, "I want you to take him away from here; I am afraid of him."

Defendant testified that he then went into Stanley's bed room and found Stanley lying on his right side, with his back towards the front of the bed. He further testified:

"A. I asked Guy, 'Why have you been treating Iva the way you have?' He said: 'I don't know as it is any of your business.' I says, 'I want you to get up and get out of here, and never set foot on my premises again. You need killing.' He said, 'Hop to her,' and

grabbed his revolver, and then I grabbed my shotgun that was sitting behind the door, and fired three shots as quick as I could.

"Q.  What did you do that for?  A.  Well, sir, I thought there was one of three things for me to do:  I either had to run, and leave my family there alone and leave my home, or shoot him, or be shot and killed.

"Q.  Did you know that he had a revolver about the—  A.  Yes, sir.

"Q.  Did you see it then?  A.  Yes, sir."

No pistol was found about the deceased after the shooting.

Several witnesses impeached the reputation of the defendant for morality, but stated that he was truthful and paid his debts.

There was an objection to the introduction of the dying statements of the deceased on the ground that the deceased was not conscious when they were made, and that they were not made under a realization of impending death.  All of the witnesses who testified to dying statements testified that the deceased, when making such statements, appeared to understand what he was saying.

The court instructed on first and second degree murder and gave all other instructions usually given in such cases, including those of presumption of innocence, reasonable doubt and self-defense.  Though requested, the court refused to instruct on manslaughter.

## OPINION.

I.  The trial court did not err in refusing to instruct on manslaughter.  In State v. Grugin, 147 Mo. 39, there was a conviction for murder.  The defendant on being correctly informed that his sixteen-year-old daughter had been ravished by his son-in-law Hadley, took his shotgun and went a quarter of a mile to where Hadley was at work, and said to him,

**Manslaughter: Assault upon Defendant's Wife.**

"Jeff, whatever possessed you to rape Alma, my daughter?" Hadley replied, "I'll do as I damn please about it." The accused testified that Hadley then pitched forward as though he was coming at him, whereupon he shot and killed Hadley. It was held that an instruction for manslaughter should have been given in that case. Judge SHERWOOD said: "Commenting on the subject of the 'Adequacy of the Cause of Excitement,' Bishop remarks: 'The doctrine under this head, appearing as it does in the books in illustrations rather than in rules, hardly admits of reduction to rule. Not attempting an impossible exactness, we may deem it in a general way to be that the law accepts human nature as God has made it, or as it manifests itself in the ordinary man, and every sort of conduct in others which commonly does in fact so excite the passions of the mass of men as practically to enthrall their reason, the law holds to be adequate cause.' [2 Bishop's New Cr. Law, sec. 701.]"

That language seems to indicate that every sort of provocation is a matter of consideration for the jury, but like all other legal rules the one there laid down is subject to some very clear exceptions and limitations. One rule is that mere words will not of themselves amount to provocation sufficient to reduce murder to manslaughter. [State v. Barrett, 240 Mo. 161; State v. Bostwick, 245 Mo. 483.] It was held in State v. France, 76 Mo. 681, that in order to reduce murder to manslaughter where a husband killed another on account of his adultery with the defendant's wife, it was necessary that the killing should have occurred at the very time of the adultery.

In State v. Holme, 54 Mo. 153, the court cited Maher v. People, 10 Mich. 212, in which the assault was committed half an hour after the husband had seen his wife and the party assaulted entering and emerging from a wood under suspicious circumstances, and had followed up and assaulted the man while laboring

under great excitement, the perspiration all over his face. But this court said in reference to that case: "But of that case it may well be observed, that the facts were all so recent and so commingled together that they might all be considered as a part of the *res gestae,* and hence admissible because making up a part of the same transaction. In cases of that kind, where the prisoner is smarting under a provocation so recent and strong that he cannot be considered as being at the time the master of his own understanding, the offense may be reduced to manslaughter, but as a general principle for the interest and well-being of society the old rule is the better one."

It appears from those authorities that there are some very clear rules with reference to what is an adequate provocation. As was said in State v. Barrett, supra, speaking of that rule, that mere words do not constitute adequate provocation, "This rule is well established, and we imagine it would not be the part of wisdom to substitute in its place one fluctuating or less rigid, which would require the accused to be judged in each case according to the excitement incident to his natural temperament when aroused by real or fancied insult given by words alone."

Law is made for the restraint of passions. The libertine must restrain his lust. The father of a family, finding his wife or daughter in the grasp of an adulterer, is tenderly considered by the law, and if in his frenzy he slays the wrongdoer, his offense is reduced to manslaughter. Where such violation of a man's home is attempted in his absence and fails, the law does not consider that there is any adequate cause to arouse the passions of the husband or father to such an extent as to overthrow his reason. He is required to restrain his passion for slaughter. Especially is that true where, as in this case, the party killed was evidently drunk, not only when he insulted the wife, but when killed by the husband. Stanley's indecent be-

havior had been tolerated by Mrs. Vest prior to Sunday night, no doubt because it was attributed to his intoxication. We call attention to the fact that the testimony of the defendant does not show that he shot in a frenzy, but that he ordered Stanley out of the house, and shot him, as he says, because Stanley was in the act of shooting him.

II.   There was no error in admitting evidence as to the dying statements. They were made when all hope of life was abandoned. The fact

**Dying Declarations.** that at one time the next morning Stanley expressed a feeling that he might live. if blood poison did not set up, does not destroy their admissibility. It was only the momentary glimmer of hope for one who felt how hard it was "to quit in the middle of the game." It is sufficient that the declarations were made at a time when there was no hope of recovery. [State v. Craig, 190 Mo. l. c. 339.]

We have not had the advantage of a brief in behalf of the defendant, but have diligently searched the record for errors, guided by the motion for a new trial, and we have been unable to find any fault with the conduct of the trial.

The judgment is affirmed. *Williams, C.,* concurs.

PER CURIAM.—The foregoing opinion prepared by Roy, C., was modified by the court and as modified is adopted by the court.