THE STATE v. JAMES M. CREIGHTON, alias W. H. GEERS, alias JIMMIE JONES, Appellant.—52 S. W. (2d) 556.

Division Two, August 29, 1932.

*T. C. Tadlock* and *Frederick Apt* for appellant.

1180

1182

*Stratton Shartel*, Attorney-General, and *Don Purteet*, Assistant Attorney-General, for respondent.

ELLISON, J.—The defendant was charged by information with first degree murder for killing one Coyne Hatton by shooting him with a pistol at Webb City in Jasper County. Upon a trial in the circuit court of that county, Division I, he was convicted by a jury and his punishment fixed at death. From the judgment and sentence on the verdict he has appealed, assigning numerous errors among which are: the denial of his application for a change of venue (so-called) to the other division of said circuit court because of the bias and prejudice of the judge; the giving of an instruction on first degree murder when (as claimed) the evidence would support nothing more than a conviction for manslaughter or at most second degree murder; the failure to give an instruction on manslaughter; the admission and exclusion of evidence; and the giving of certain instructions. The nature and number of assignments necessitate a long opinion.

On the night of May 16, 1931, about 11:15 P. M. the appellant Creighton, a Miss Adams and one Mickey Carey and wife parked their automobile at the east curb of Webb Street in Webb City. The street runs north and south along the west side of Morgan's Drug Store. The car was placed about forty feet north of the rear of the drug store, on the north side of a cross alley, and about in front of a dwelling house with a small tree in the corner of the yard. The tree stood back eight or ten feet from the sidewalk and about the same distance north of the alley.

The appellant and the three other parties mentioned had been out together all that afternoon and evening. Mrs. Carey's arm had been cut and they went to the drug store to have the wound dressed. All four got out of the car. Mr. and Mrs. Carey went into the drug store and Miss Adams had started to follow. The appellant was still close by the automobile when, according to his version, the deceased Hatton suddenly came up and accused him of being out with his (Hatton's) girl, Miss Adams, and assaulted

him, reaching toward a hip pocket. Appellant contends he thereupon shot Hatton in self-defense. The State maintains it was a deliberate murder.

Several eyewitnesses testified for the State. A party of five or six young people from seventeen to twenty years old were in or near a Dodge touring car belonging to a young man named Irby, which, also, was parked at the east curb of Webb Street by the side of the drug store, approximately fifty feet south of the small tree mentioned. All the young people in this group heard shots fired, the reports apparently coming from the vicinity of the small tree. Most of them saw the flashes of fire and said there were three shots, one, followed by a pause, and then two more in rapid succession.

Three of the witnesses in this group of young people saw the appellant and another man (who proved to be the deceased Hatton) standing by the tree. Hatton was on the inside, or easterly, and the appellant near the outside edge of the sidewalk. Miss Pearl Meador, one of these witnesses, said when the last two shots were fired Hatton put his hands to his chest, said ''Oh,'' and fell to the ground. Howard Marlar, another of the group, said he saw the two men standing near the tree just before the shots were fired and that the report thereof sounded as he was in the act of getting into the Irby car. He saw nothing unusual in the movements of the two men before the shooting. Miss Stansberry, still another of the party, heard a shot, looked up, and immediately two more shots were fired. She saw a man take two steps, put his hand to his breast and heard him say ''Oh.'' He fell, staggering to the southeast away from the sidewalk.

Immediately before the shooting Miss Adams, heretofore mentioned as being in the appellant's party, came hurriedly up to Miss Meador and Miss Stansberry in a state of excitement saying ''Mary, Mary!'' Then, discovering her mistake (neither of the two girls being Mary) Miss Adams proceeded on south. A Miss Clopton testified that Miss Adams walked up to her just as the shots were fired and seemed frightened. Miss Clopton asked Miss Adams to go with her but the latter declined. Several of these witnesses testified that the appellant passed them walking south along the sidewalk, from the location of the little tree, right after the shooting. That was after Miss Adams had passed.

One of this group of witnesses said she saw the deceased Coyne Hatton in the Morgan Drug Store about 9:30 that evening, and about 11 o'clock he drove up in front and looked in. Another witness stated that a little more than half an hour before the shooting Hatton had been engaged in conversation with some of the young men in her party and had driven away northward alone in an automobile. The de-

fense offered to show that on that occasion the deceased was drunk and had quarelled with the young men, but the evidence was excluded.

Another eyewitness was Mr. Kenneth Robinson, a young graduate of the Webb City High School, eighteen years old. He was not with the party of young people above mentioned, but had been at a pool hall on south beyond the Morgan Drug Store. He was walking north on the east side of Webb Street and had got to a point close to the cross alley behind the drug store when he saw two men standing on the sidewalk on the north side of the alley by the little tree. They were about three feet apart, the shorter man being about the middle or west part of the sidewalk and the taller near the east edge. He estimated they were 30 feet from him. The taller man (who later proved to be the deceased Hatton) stepped back and the shorter man (the appellant) raised his hand and fired one shot with a pistol. Hatton staggered back east or southeast about six feet. After a pause two more shots were fired, the appellant stepped back up on the sidewalk from the yard with the pistol still in his hand, put the pistol away—on some part of his body—pulled up his coat, pushed back his hat on his head, and walked south passing the witness right about the south curb of the alley. So far as the witness observed, appellant did not pick up any hat from the ground. Hatton fell by the tree.

Post mortem examinations of the body of the deceased disclosed there were three bullet wounds all in the chest, two of them being within an inch and a half of the left nipple and one a little below the collar bone. One of the wounds was badly powder burned, clear through the shirt, another slightly so, and the third not at all. The three bullets all passed clear through the body, one horizontally and two ranging downward. At least two of them would have been instantaneously fatal. The right hand was powder burned and there was a slight bruise on the right arm, but no bullet wound on either. Some powder marks were visible also on the left side of the neck. The wound most heavily burned probably was made with the pistol about one foot away.

The morning after the homicide the appellant was arrested in his room by the Joplin police. He offered no resistance and pointed out to them his open traveling bag in which they found a revolver three chambers of which appeared to have been recently fired. He also had a sawed-off shot gun in a violin case. Both weapons were fully loaded. When booked at the police station he gave the name of Geers. Two days later he called for the Chief of Detectives, Mr. Portley, and in the latter's office said: "I want to tell you all about this thing, about the shooting and that. I am hot all over. I am

wanted for the Nebraska bank robbery,'' the Hastings job. He further stated his true name was James Creighton; that he was born at Hugo, Oklahoma, had a wife living at Seminole; and that he was twenty-six years old. In answer to questions about the shooting he said, ''Well, I shot him. I don't know. I had been drinking.'' He said he had never seen the deceased Hatton until the night of the shooting. Thereupon Chief Portley, being unable to get in touch with the prosecuting attorney, called Judge S. W. Bates, special counsel for the State, who came to the jail in the same evening and the appellant's statement was reduced to writing and signed by him before a notary public.

The next morning Judge Bates asked the appellant what prompted him to shoot Hatton. After deliberating he answered he couldn't afford to be imposed on; that he was under cover for the Nebraska job, and that he couldn't stand for an arrest even for a minor offense.

The written confession covered many of the facts already set out. In it the appellant further said he had been twice convicted and served terms in prison, the first time at Bannock, Oklahoma, for two years on a charge of burglary, and the second time at McAllister, Oklahoma, for five years for a car theft. After telling how he had spent the afternoon and evening with Miss Adams and Mr. and Mrs. Mickey Carey he said Carey parked their automobile on the east side of Webb Street just north of the alley in the rear of the Morgan Drug Store; and all four got out of the car, Mr. and Mrs. Carey going on into the drug store. Miss Adams had just stepped up on the sidewalk when a man brushed against the appellant as he stood in the parkway and took hold of the left side of his coat saying ''Are you looking for trouble.'' Appellant said he replied ''I beg your pardon,'' and then the statement goes on: ''And I pulled my pistol from my belt where I was carrying it and started shooting. I fired either two or three shots. The man fell east across the sidewalk. When the man met me Doris Adams, who had walked south some steps, turned and came back and said 'This fellow is all right. He has a wife and child' or 'children.' I am not certain which. She had turned and started away again when I started shooting. I carried this same pistol all the time. I had it with me during the afternoon when I was in Webb City. It is a Colt's .38 Special Police Positive. I had been drinking all afternoon and was under the influence of liquor. His conduct made me mad and I fired.''

The statement went on to say that after the shooting the appellant walked south to the front of the drug store, went in, and passed on out through the back door into the alley. Then he crossed Webb Street, passing the body of the deceased, and turned north to the next street.

Thence he went about half a block west and rejoined Mr. and Mrs. Carey, who had gone to that spot for some unexplained reason. They drove him back to Joplin to his room. He remained there that night and was arrested the following morning.

The appellant testified in his own behalf. Much of what he said corresponded with his written confession and previous oral statements to the police. Going direct to the homicide and the events immediately preceding, he stated that he and Miss Adams had alighted from the automobile, and she had started to follow the Careys into the drug store. The appellant was standing on the parkway and in the act of closing the car door when the deceased walked up and brushed against him, asking him if he was looking for trouble. The appellant responded, "Beg your pardon." Hatton then demanded "what are you doing with my girl?" to which appellant answered, "I didn't know it was your girl." Hatton said: "You ——————, you out with my girl. I got a date with her tonight." The appellant continued: "So he grabbed me by the lapel of the coat and turned me around, and when he did he slapped me and my hat flew off, and so he stepped back and let his hand back like that (illustrating) and I pulled my pistol, and that is all I remember."

In answer to questions appellant further said: "Yes I shot. I was afraid he was going to kill me. He acted like he was mad and sore about something." The appellant then offered to testify the deceased was drunk and quarrelsome at the time. This evidence was excluded by the court on the ground assigned in the State's objection, that the fact constituted no defense. Appellant continued by stating he fired one or two shots, he didn't know how many, and then went into the drug store by the front door seeking Mickey Carey. Up to the time the deceased brushed against him he didn't know there was such a person on earth.

On cross-examination the State brought out that the appellant had been twice convicted in Oklahoma for felony. He admitted he had carried the revolver with which he did the shooting under his belt in the front of his trousers throughout that day. He was closely cross-examined as to all the facts occurring at the time he and the three others got out of the Carey automobile, as to Miss Adams' leaving and coming back when Hatton assaulted him, and as to the actual altercation between the two. Appellant insisted he made no hostile movement toward Hatton until the latter had stepped back and reached for his hip pocket. When he shot Hatton the first time the latter just stood still at a distance of two or three feet, and then advanced on him. Then the second shot was fired. After the first shot the appellant says he was excited, but he fired the second shot because Hatton was coming toward him. At that time Hatton had his right hand on his hip, as well as before the firing of the first shot.

Mrs. May Groff testified she lived in the little house in the dooryard of which the homicide was committed. She was asked whether Coyne Hatton came to her door about half an hour before the shooting, but the State's objection to the question was sustained. Thereupon the appellant offered to show that the deceased was a large, powerful young man and that just a few minutes before the shooting he came to her door asking for his car saying it was lost, he being at the time intoxicated. This offer was rejected. A further offer was made to prove that immediately preceding the homicide the deceased Hatton in a drunken condition assaulted a young man named Orel Irby without provocation in the presence of two of the latter's companions. The proffered testimony was excluded on the ground that it constituted no defense and dealt with a collateral matter.

In rebuttal the State showed by the widow of the deceased that he was left handed and never had a revolver. The undertaker testified as to the articles found on his person, and these did not include a revolver.

On June 19, 1931, appellant served notice on the prosecuting attorney that he would make application for a change of venue the next day on account of the bias and prejudice of the judge of Division I of the Jasper County Circuit Court in which the case was pending. A verified application was accordingly filed, supported by the affidavits of two witnesses, D. E. Buckner and W. H. Thompson. When the same was taken up by the court on June 20, the prosecuting attorney introduced the affiant Mr. Thompson, and announced he desired to make a statement relative to his execution of the affidavit. Over the objections and exceptions of the appellant that the affiant could not contradict his affidavit, and since the same was in due form the court had no right to hold a hearing thereon. Mr. Thompson was permitted to testify that he was appearing at his own request; that he signed the affidavit without reading it and without knowing anything about the facts, or what case it was to be used in. He further said the application was presented to him in the Frisco Railroad station, and that no notary was present when he signed it. He admitted the other affiant Mr. Buckner came in before the transaction was completed.

One of the attorneys for the appellant took the stand denying Mr. Thompson's testimony and stating in substance that the affidavit had been fully explained to him. This witness admitted, however, that the signature and seal of the notary public were affixed to the affidavit before it was presented to either of the affiants. The court took a recess to look up the law and then ruled that since neither of the supporting witnesses subscribed and swore to the affidavit before a notary public, but executed the same after the notary's jurat had

been affixed and out of her presence, the affidavit was void and the application therefore failed to comply with the statute; and the same was thereupon overruled.

Two days later when the case was called for trial counsel for appellant asked leave to file "a supplemental affidavit and petition for change of venue" on account of the bias and prejudice of the judge. It was shown that notice of intention to make the application had been served on the prosecuting attorney that same day. The application was supported by the affidavits of two new witnesses. The prosecuting attorney objected on the ground that the appellant was not entitled to file more than one application for a change of venue, even though the first application had been found insufficient. Counsel for appellant, though still insisting that the first application was sufficient and could not be impeached, further contended that if the first application was void, then the new application in point of law was the first and only one. The State made the further objection that since both applications admitted the appellant had become aware of the bias and prejudice of the judge on June 19, it was too late for him to wait until three days later on June 22 to serve notice and file (the new) application. The court overruled the second application without specifying its reasons.

I. The first assignment is that the trial court erred in giving an instruction on murder in the first degree. Appellant contends the evidence shows there was no time for deliberation, an essential element of that degree of the crime, State v. Liolios, 285 Mo. 1, 20, 225 S. W. 941, 947, since there was proof he did not know the deceased, and that the latter suddenly came out of the darkness, brushed against him, cursed and assaulted him, the homicide following immediately. But the evidence is not by any means all one way that the appellant killed in self-defense or that the homicide resulted from either a lawful or a just provocation. Several persons close by neither heard a dispute nor saw a struggle. From the account they gave the jury may have believed the deceased was not the aggressor. The appellant went about armed, and according to the State's evidence he declared at the police station after being taken into custody that he was under cover for "the Nebraska job" and shot the deceased because he couldn't risk an arrest even for a minor offense. This showed calculation, design and a disregard for human life. There was ample basis for a first degree murder instruction.

II. The next assignment is that an instruction on manslaughter should have been given, and we think the point is well taken. The appellant testified the deceased committed an unprovoked assault and battery upon him accompanied by opprobrious epithets. There is no direct testimony corroborating this, but the State's evidence does

show Miss Adams hurried from the place where the two men met, in a state of agitation, and the prosecution further introduced the appellant's written confession in which he declared he was angered because of the deceased's conduct—brushing against him, taking hold of his coat and asking him if he was looking for trouble.

Where the record shows personal violence—a battery—inflicted upon the slayer by the deceased at the time of the homicide, the general rule is that a manslaughter instruction is called for, State v. Bongard (Mo.), 51 S. W. (2d) 84, not yet reported; and this is true though the evidence consist of the testimony of the defendant alone: State v. Heath, 221 Mo. 565, 581, 121 S. W. 149, 153; State v. Stewart, 278 Mo. 177, 185, 212 S. W. 853, 855.

But the State points out it is not the personal violence offered by the deceased but the *effect thereof on the mind of the defendant* that reduces the grade of the homicide to manslaughter, State v. Burrell, 298 Mo. 672, 681, 252 S. W. 709, 712; and argues that on this ultimate question there is no better witness than the defendant, himself, whose mental state is under investigation—especially where he makes an admission against interest. And so it is contended that since the appellant declared to the police he shot to avoid arrest, and later on the stand testified he killed in self-defense—for these reasons, we say, it is urged there is no evidence of heat of passion and therefore no question of manslaughter in the case, though appellant did testify the deceased committed a battery upon him.

There are decisions sustaining the State's position. In State v. Shuster (Mo. Sup.), 183 S. W. 296, 299, it is said "ordinarily a defendant may not be heard to complain that the courts followed his version of the facts of a crime." In State v. Foran, 255 Mo. 213, 221, 164 S. W. 215, 217, the defendant's testimony was that his wife had a revolver and started to shoot him. He seized her and while they were struggling for the weapon it was discharged—unintentionally he claimed—killing her. Being prosecuted for murder, on appeal the defendant complained of the trial court's refusal to give a manslaughter instruction. This court said: "The defendant's testimony disclaims manslaughter and self-defense, and claims that the killing was accidental. Manslaughter is not consistent with the theory of the State or of the defendant." In State v. Davis (Mo.), 217 S. W. 87, 93, the defendant swore he and the deceased were engaged in a physical struggle, the deceased having a revolver with which he was trying to shoot the defendant. The opinion by RAILEY, C., held a manslaughter instruction should have been given, but none of the judges concurred. In a separate opinion WALKER, J., said: "The rule which authorizes an instruction of this character, when based upon the testimony of the accused alone, must be construed with reason in

connection with all the other facts in the case." Likewise, in State v. Hostetter (Mo.), 222 S. W. 750, 755, the defendant's account of the killing was that he stabbed the deceased after the latter had struck him and was in the act of cutting him with a knife. His "whole thought was to save his life." This court held a manslaughter instruction was not warranted. So, also in State v. Wade, 307 Mo. 291, 306, 270 S. W. 298, 302, the defendant testified he and the deceased were grappling after the latter had shot his finger. Being asked why he killed the deceased, he answered, it was because the latter was trying to get his revolver in range of his (defendant's) chest. This court held the defendant's testimony evidenced the utmost coolness, not heat of passion, and ruled the trial court correctly refused to give an instruction on manslaughter.

All the foregoing are decisions in which the defendant's testimony showed an actual battery committed upon him by the deceased, and yet a manslaughter instruction was held improper because the facts failed to disclose heat of passion engendered thereby, leaving only a case of murder on the one hand, or self-defense on the other. The same ruling was made in State v. Burns, 278 Mo. 441, 449, 213 S. W. 114, 117, where the deceased in a rage drove the defendant out of a post office and shot at him with a revolver. Similarly, in the very recent case of State v. Clough, 327 Mo. 700, 705, 38 S. W. (2d) 36, 38, the defendant's version of the killing was that the deceased approached him rapidly, uttering threats and abusive language, and threw two rocks at him, whereupon he shot in self-defense. It was held the homicide was not the result of sudden passion, according to the defendant's own story, and that there was no room for a manslaughter instruction. Other cases treating the defendant's testimony as more or less decisive against manslaughter are: State v. Perno (Mo.), 23 S. W. (2d) 87, 91; State v. Stenzel (Mo.), 220 S. W. 882, 884; State v. Fletcher (Mo.), 190 S. W. l. c. 322; State v. Vest, 254 Mo. 458, 468, 162 S. W. 615, 620; State v. Gartrell, supra, 171 Mo. l. c. 522, 71 S. W. l. c. 1055; State v. Inks, 135 Mo. 678, 692, 37 S. W. 942, 946.

On the other hand, there are decisions to the contrary which hold that if the evidence shows personal violence to the defendant he will be entitled to a manslaughter instruction notwithstanding he protests as a witness that he killed the deceased unwillingly, to save his own life. The doctrine of these cases is that evidence of violence to the person makes a jury question as to whether the killing was done in hot blood, and that the jury may believe the defendant's testimony concerning the battery, but disbelieve he acted in self-defense. And so it is reasoned he should have a manslaughter instruction in spite of his testimony on self-defense. Cases of this type are State v. Stallings, 326 Mo. 1037, 1045, 33 S. W. (2d) 914, 917; State v. Harp,

306 Mo. 428, 433, 267 S. W. 845, 847. The Stallings case quotes from State v. Heath, supra, 221 Mo. 1. c. 584, 121 S. W. 1. c. 154, holding that where there is evidence of an assault sufficient to constitute adequate provocation, the issue on that grade of homicide (manslaughter) should be submitted to the jury, it being for them to say whether the passions of the defendant were in fact aroused.

Along the same line State v. Bidstrup, 237 Mo. 273, 284, 140 S. W. 904, 907, followed in State v. Schamel (Mo.), 177 S. W. 351, 352, rules the testimony of a defendant against interest does not rise to the dignity of a conclusive judicial admission, but is to be treated like the adverse testimony of any other witness; and that a defendant is therefore entitled to a self-defense (or manslaughter) instruction though inconsistent with his own testimony, if warrant therefor be found in any other evidence in the case, including that for the State. In such circumstances the fact that the defendant testifies he killed solely to save himself does not commit him exclusively to that defense unless something is done to influence the course of the trial and confine it to that theory. [State v. Philpott, 242 Mo. 504, 511, 146 S. W. 1160, 1161, et seq.; State v. Baker, 262 Mo. 689, 697, 172 S. W. 350, 353.]

How are these two lines of decisions to be reconciled? It is fundamental that neither the trial court nor this court can pass on the weight of the evidence in a criminal case; that function belongs to the jury. [Sec. 3662, R. S. 1929.] If there is substantial evidence of lawful provocation the defendant is entitled to an instruction on manslaughter. Proof of an initial assault and battery upon him by the deceased is such evidence because it measures up to the standard exacted by the law and in point of fact warrants an inference that heat of passion was engendered thereby. That inference (not presumption) being introduced into the case, how can any amount of evidence to the contrary take it out, though, perhaps, clearly outweighing it? Is it true, as is held in the Davis case, supra, 217 S. W. 1. c. 93, that when the question (of giving a manslaughter instruction or not) is dependent on the testimony of the accused alone, the *court* must construe what he says "with reason in connection with all the other facts in the case," or is that exclusively the province of the jury; and is the defendant not entitled to the benefit of the most favorable inference that may reasonably be drawn from any part of the evidence in the record, as would be true in any other case? We think the latter is the correct rule and that the Davis case and the other mentioned cases like it should be disapproved, so far as they hold to the contrary.

At first blush there seems to be good reason for saying that when a defendant, to exalt his defense of self-defense, testifies he killed

unwillingly and only to save his own life—in these circumstances, we say, it seems he ought not be permitted still to go to the jury on the contrary theory that he killed in rage, without legal justification. But this is all bottomed on the idea that the law will take him at his word and hold him conclusively to what he says—whereas, the rule is that his testimony is like that of any other witness; and he has the right to avail himself of such favorable inferences as the record affords, even though the jury disbelieve his story of self-defense. To accord him only the benefit of such inferences as the whole record will support, is to invade the province of the jury and cast him on the weight of the evidence.

In this particular cause the appellant is fortified by the further fact that the State proved an oral statement by him to the effect that he was angered by the conduct of the deceased. This makes the facts much like those in State v. Burrell, supra, 298 Mo., l. c. 676, 684, 252 S. W. l. c. 710, 713. We hold a manslaughter instruction should have been given.

■ III. Appellant assigns error to the overruling of his two applications for a change of venue, both charging bias and prejudice on the part of the trial judge. The statutes affirmatively require such applications to be supported "by the affidavit of at least two reputable persons, not of kin to or counsel for the defendant." [Secs. 3648, 3649, R. S. 1929; State v. Bryant (Mo.), 24 S. W. (2d) 1008.] The affidavit supporting the first application was wholly insufficient —in fact was not an affidavit at all—because neither affiant appeared before the notary in any way and took an oath. [2 C. J. sec. 48, p. 337; State v. Privitt, 327 Mo. 1194, 39 S. W. (2d) 755, 757.] But the question is whether the trial court erred in holding a hearing thereon and allowing the State to impeach the affidavit and the notary's jurat, which were regular on their face. The statute, Section 3649, supra, says "it shall be lawful for the judge to hear and determine such application."

It has often been held a trial judge cannot pass upon his own prejudice and that the filing of a properly drawn application for change of venue (so-called) charging such prejudice disqualifies him except to direct the substitution of another judge. [State v. Meyers, 322 Mo. 48, 51, 14 S. W. (2d) 446, 447.] On the other hand the mere filing of the application does not deprive the court of *jurisdiction*, which latter continues until an order is made transferring the cause. In the exercise of that jurisdiction it is the duty of the court to determine whether the application is in due form and due time. [Little Tarkio Drainage Dist. v. Richardson, 227 Mo. 252, 260, 126 S. W. 1021, 1023.]

The manner of executing the affidavit pertains to its form and not to its substance. In the Privitt case, supra, 327 Mo. 1194, 39 S. W. (2d) 1. c. 757, it was held that although, according to certain authorities, the substantive averments of a petition for a search warrant fair on its face cannot be impeached by evidence *aliunde*, yet, nevertheless, this rule does not preclude a judicial inquiry into whether the prosecuting attorney did in fact make oath to the petition. And State ex rel. Sawyer v. Kelly (Mo.), 48 S. W. (2d) 864, 866, ruled that although Section 3630, Revised Statutes 1929, makes it mandatory on the circuit court in certain counties to grant a change of venue when an application therefor is filed charging prejudice on the part of the inhabitants, if the application be supported by the affidavits of five or more credible disinterested citizens of the county residing in different neighborhoods, yet the court may look behind the affidavits and ascertain whether the affiants do reside in diverse neighborhoods of the county. By the same line of reasoning we think the trial court in this case had the right to hear evidence on whether the two subscribing witnesses did in fact subscribe and swear to the affidavit before the notary—the ground on which the court's ruling was based—though it was error to extend the inquiry further by inquiring into the truth of the substantive charges in the affidavit.

██ ██ But if, as the trial court held, the first application was a nullity, then the second application against the same, original judge, was in point of law, the first and only one, and did not offend against the rule that only one change of venue can be allowed under Section 3648, announced in State v. Wagner, 311 Mo. 391, 404, 279 S. W. 23, 26, and earlier cases. Neither was it defective because no notice thereof had been given until the day it was presented. Sections 3648 and 3649 do not require notice of applications filed thereunder. [State v. Mitts (Mo.), 29 S. W. (2d) 125.] There are cases holding applications based on prejudice of the judge are properly overruled when filed so late that the circumstances indicate bad faith: State v. Davis, 203 Mo. 616, 622, 102 S. W. 528, 530; State v. Weber (Mo.), 188 S. W. 122, 127; but whatever latitude may be allowed trial judges under these decisions it is evident they can have no binding force here, because the record shows the appellant gave notice of his first application on June 19; that it was overruled as void on June 20 because of formal defects; and that the appellant then filed a new or supplementary application before the trial started on June 22, notice thereof being given the same day.

██ The State contends both applications were insufficient because the supporting affidavits alleged only conclusions and not facts. The statute, Section 3648, says the verified application, supported by the

affidavit of at least two reputable persons, etc., must state "that the judge of the court in which said cause is pending will not afford him (defendant) a fair trial." The affidavit of the two persons who supported the second application here (which alone we need consider) said the judge "will not afford defendant James Creighton, a fair and impartial trial in said cause for the reason alleged in said petition, to-wit that . . . (the judge) will not afford the defendant a fair and impartial trial, on account of his bias and prejudice against the defendant."

Applications in substantially the foregoing form have been several times held sufficient: State v. Mitts, supra, 29 S. W. (2d) 125; State v. Meyers, supra, 322 Mo. l. c. 50, 14 S. W. (2d) 447; State v. Shipman, 93 Mo. 147, 6 S. W. 97. The State relies on State v. Wilcox (Mo.), 44 S. W. (2d) 85, and decisions there cited, discussing applications for change of venue on account of prejudice of the inhabitants, under Section 3630, Revised Statutes 1929, which were held insufficient for failure to state facts. But Section 3630 says an application filed thereunder "shall set forth the facts or grounds upon which such change is sought;" the facts take a much wider range; and the judge is not dealing with a question of his own prejudice. To say, as the affidavit in this case did, that the judge will not afford the defendant a fair trial is to state the fact in the very language of the statute, Section 3648. The distinction between ultimate facts and conclusions is sometimes difficult to draw; and it is hardly to be thought the Legislature intended to require affiants to go into detail about the alleged prejudice of the judge. We hold the second application was sufficient; and that the judge should have sent the cause to the other division of the Jasper County Circuit Court.

IV. The next assignment is that the court erred in instructing the jury they should assess the punishment of the appellant at death or imprisonment in the penitentiary for life if they found him guilty of murder in the first degree. Appellant contends it is the duty of the court to assess the punishment in such cases, citing State v. Adams, 323 Mo. 729, 19 S. W. (2d) 671. That case merely decided the part of Section 3984, Revised Statutes 1929 which provides "and the jury shall decide which punishment shall be inflicted" is unconstitutional and has no place in the statute—for reasons unnecessary to repeat here. But there still remain in our statutes Section 3703, Revised Statutes 1929 providing that "in all cases of a verdict of conviction for any offense where by law there is any alternative or discretion in regard to the kind or extent of punishment to be inflicted, the jury may assess and declare the punishment

1198

in their verdict . . . ;" and Section 3704 saying, "Where the jury agree upon a verdict of guilty but fail to agree upon the punishment to be inflicted or do not declare such punishment by their verdict; the court shall assess and declare the punishment and render judgment accordingly." These two sections cast the duty primarily on the jury to fix the punishment, as is tacitly conceded in the Adams case and has more recently been explicitly held in State v. Bevins, 328 Mo. 1046, 43 S. W. (2d) 432.

■ V. Appellant complains of the trial court's refusal to permit him to show that at and just before the homicide the deceased was drunk and in an ugly mood. Undoubtedly, if the deceased was intoxicated and belligerent at the time of the homicide, the appellant had a right to show it. If the same condition existed so shortly before that time as to affect his mental state when he encountered appellant, it would likewise be admissible. [30 C. J. sec. 483, p. 246; State v. Malone, 327 Mo. 1217, 39 S. W. (2d) 786.] While it is true evidence of disconnected difficulties with third parties has been held incompetent in several cases, yet this rule cannot apply to proof of a mental condition which would continue down to the time of the event under investigation and enter thereinto. In what has just been said we refer, of course, to cases in which self-defense is an issue and the question as to who was the probable aggressor becomes important.

■ VI. During the presentation of the State's main case the chief of police of Hastings, Nebraska, identified as his own the revolver found in the possession of the appellant when arrested, and said it had been taken from him when he attempted to arrest the appellant at Hastings for bank robbery some eleven weeks before. He further stated he had talked with the appellant since coming to Jasper County for the trial, and that the latter admitted being present when the revolver was taken and that he got it at that time. To all this appellant's counsel vigorously objected claiming the evidence was directed to a collateral matter tending to connect him with a separate crime, and announcing the appellant had not denied and would not deny he committed the homicide with that particular revolver. The prosecuting attorney argued the appellant was standing on the presumption of innocence and requiring proof of every element of the crime; and that the State could not safely assume he would admit killing Hatton at the time and place alleged with the weapon under discussion. All this dispute took place out of the presence of the jury and covers nearly 20 pages of the bill of exceptions. The court overruled the objections, especially in view of the prosecutor's opening statement declaring he would show an admission

by appellant to the Joplin police that he was under cover for a bank robbery at Hastings (as was later done). This is assigned as error.

It would have been competent to prove appellant's prior posses-sion of the revolver if it had tended to connect him with the homi-cide and the fact were in issue. [State v. Francis, 52 S. W. (2d) 552, not yet reported.] But in view of his counsel's announcement that the fact was not in issue, we think the evidence was improper, although the admission was not made in the presence of the jury. The State could have demanded that, or have introduced the evi-dence later if the fact had been denied. Since the State had proof of an admission by appellant that he was wanted at Hastings for bank robbery and killed to avoid arrest, evidence corroborative there-of would have been competent, but it was unnecessary to show the revolver was taken away from the chief of police while he was at-tempting to arrest the appellant.

VII. The court gave an Instruction 3 for the State saying in substance that the argument of counsel was for the purpose of aiding the jury in reaching a proper verdict, by refreshing their minds as to the evidence in the cause, and showing the application of the law thereto; but that whatever counsel might say, it was their duty to be governed by the evidence as they understood and remembered it, and the law as declared in the instructions, and that they should render such verdict as in their conscience, reason and candid judg-ment seemed just and proper. It is contended this instruction con-stituted an undue restriction upon appellant's counsel in their argu-ment to the jury. Similar instructions were approved in State v. Tighe (Mo.), 289 S. W. 829, 830; State v. Farrell, 320 Mo. 319, 6 S. W. (2d) 857, 860. Such cautionary instructions are largely within the discretion of the trial court; and we can see no abuse of that discretion in giving of the instruction in this case.

VIII. By instruction No. 4 the court told the jury that in arriving at their verdict they should not consider any evidence stricken from the record by the court or any offer made during the progress of the trial to prove any fact or facts. Appellant asserts this instruction was misleading because it failed to exclude from the consideration of the jury only offers of proof where the offer was re-jected *and the proof excluded*. The instruction perhaps might have been a little clearer but in our opinion could not have misled the jury. They would undoubtedly understand an *offer* to prove facts did not cover facts admitted in evidence and submitted to them for consideration.

 IX. Complaint is made of Instruction 10 which said that one who intentionally uses upon another at some vital part, a *deadly weapon*, must be presumed to intend death, etc. Appellant maintains this instruction was unnecessary and improper, and tended to minimize his defense of self-defense. We think this criticism is just. [State v. Malone, supra, 327 Mo. 1217, 39 S. W. (2d) l. c. 793.] The facts attending the homicide were detailed by eyewitnesses, and the appellant did not deny its commission, or claim it was unintentional. He invoked only the defenses that it was done on either just or lawful provocation, and that he killed in self-defense, all of which predicate an intent to kill or inflict bodily harm. In these circumstances no instruction on the presumption was called for.

X. Appellant complains of Instruction 15, stating that words and epithets, however opprobrious and insulting, do not justify an assault. The instruction has been condemned in several recent decisions, where self-defense was an issue. [State v. Malone, supra, 327 Mo. 1217, 39 S. W. (2d) l. c. 794.]

Several other procedural errors are assigned, including the denial of appellant's application for a continuance; but these need not be considered. For the reasons given the judgment and sentence are reversed and the cause remanded for another trial. *Henwood, J.,* concurs; *White, P. J.,* concurs in result.