THE STATE v. THOMAS H. GREEN, Appellant.—55 S. W. (2d) 965.

Division Two, December 14, 1932.

*Charles E. Gibbany* and *F. P. Stapleton* for appellant.

*Stratton Shartel*, Attorney-General, and *Denton Dunn*, Assistant Attorney-General for respondent.

724

HENWOOD, J.—An information was filed in the Circuit Court of Gentry County by which the defendant was charged with murder in the first degree. The jury found him guilty of murder in the second degree and assessed his punishment at imprisonment in the penitentiary for twelve years. He was sentenced accordingly, and in due course appealed.

Ulysses S. Crawford, the victim of the alleged murder, was shot by the defendant with a "44" revolving pistol in the town of Gentryville, in Gentry County, about 11:45 o'clock in the morning of March 2, 1931. The defendant was then eighty years of age, and Crawford was "around 70." The defendant's thumb and fingers on his left hand had been stiff and bent out of their natural shape for a long time as the result of an injury to his left wrist. Crawford was much larger than the defendant, but on account of his affliction with rheumatism did not have "good use" of his legs. The defendant was a widower, and had no near relatives except a son and four grandchildren who lived in Des Moines, Iowa. He "had a horror

of being put in the county home,'' and resented suggestions that he should be cared for and supported by the county. For four or. five years he lived alone in a shack, about two miles and a half southea·⸱ of Gentryville, on a tract of twenty-two acres of land which he rented from Crawford. He assisted in clearing the land and in building the shack and the fences around it. He subrented the pasture and the corn ground and raised potatoes, beans and pumpkins in the garden patch. In the early part of December, 1930, he had a public sale at which he sold all of his batching outfit except his bedding and a part of his furniture, and went to Des Moines to visit his son and grandchildren. He left his bedding and unsold furniture in the shack and the purchasers of his bedstead and cookstove had not removed those articles from the shack at the time he returned from Des Moines, about February 1, 1931. From that time until the day of the shooting he lived at the home of one of his neighbors, about a quarter of a mile from the shack, but slept at the shack a part of the time. While in Des Moines and immediately after his return from there he heard that Crawford had rented the twenty-two acres of land to his son. About three or four days prior to the day of the shooting, Crawford's son, then at work on the land, told the defendant that he had rented the land from his father. On the day of the shooting the defendant walked to Gentryville, carrying his pistol in a ''scabbard'' under his overcoat. Shortly after reaching Gentryville he met Crawford in front of a restaurant. A conversation between them ended in a fight, in the course of which the defendant drew his pistol and fired two shots, and Crawford was mortally wounded by one of the shots. Several witnesses testified that they saw the affray, but none of them testified as to what was said by the defendant or Crawford immediately prior thereto, and their testimony varies as to what occurred during the progress thereof.

Some of the State's witnesses testified that the defendant and Crawford were ''quarreling,'' and that Crawford had his cane ''up in the air'' in his right hand, immediately before the fight; that they clinched and scuffled and fell; that they ''got up,'' and the defendant ''jerked back his overcoat'' and drew his pistol, and Crawford grabbed him, and the defendant hit him ''over the head'' twice with his pistol and then fired the first shot; and that they continued to scuffle on their feet until the second shot was fired. Other witnesses for the State testified that Crawford was down on his back, and that the defendant was stooping over him, when the second shot was fired. And other witnesses for the State testified that they were still scuffling on the ground after the second shot was fired. The coroner, an osteopathic physician, testified, for the State, that he examined Crawford's body shortly after the shooting and found ''a bullet hole

directly over the heart, about the second intercostal space," with indications of instantaneous death from the bullet, which "looked like it ranged just a very slight but upward," and "some little scalp wounds"—cuts and bruises on the left side of the head. The State also produced witnesses who testified that, about ten days prior to the day of the shooting, the defendant said, "I heard that he (Crawford) has rented it (the twenty-two acres of land) to his boys, and if he undertakes to put me off of the place he will never live to put another man off," and, "If Mr. Crawford undertakes to put me off there (the twenty-two acres of land), he won't put nobody else off," and, "If they have got that rented (the twenty-two acres of land), they may walk in there, but they will have to be hauled out."

The defendant testified: He talked to Crawford about visiting his son and grandchildren in Des Moines, and Crawford said, "That is right, you ought to do that;" and he then said to Crawford, "I will be back by the 1st of March or before to get to work again." He told some of the State's witnesses that Crawford had never notified him to vacate the twenty-two acres of land, and that he did not believe Crawford would try to "dispossess" him without first giving him such notice, but did not make any statements in the nature of threats against Crawford at any time. Prior to the day of the shooting he and Crawford had always been "splendid good friends." He carried his pistol to Gentryville on the day of the shooting to "defend" himself against Jim Good and Clay Baxter, because he knew they were "carrying a gun for" him. Upon meeting Crawford in Gentryville that day he said, "Lis, you have given me rather a bitter pill, you have forcibly taken the place away from me without giving me notice to vacate it," and Crawford said, "I don't have to give you no notice, if you don't shut your mouth and keep still, and not make any trouble about the place, I think I will go right up to Albany and have the authorities run you into the county farm." He then said, "Mr. Crawford, the way everything has gone, from what has gone before, I guess you would be lowdown enough to do that," and "right then" Crawford struck at him with his cane, and he "throwed up" his left hand and the cane struck his left hand. In this connection he further testified: "Just as soon as he hit me, I seen what was done, I just jerked that gun out, and shot it off. I didn't aim it at anybody in particular or anything. I don't know whether that shot hit him. He dropped his stick and clinched me, jumped and grabbed me, and I seen that I couldn't do nothing, and I just throwed my arm around his neck and held it. I had no use of that hand, it was just paralyzed, and I throwed my arm around his neck, and he kept trying to throw me, kept trying to take the gun away from me, and I knowed I wasn't no match for him, and the only thing I could

do safely was to break his hold and get away from him, but I couldn't do it; he had hold of me, and I couldn't get away. His right arm was under my side, and he had his left hand throwed up, trying to get the gun. I knowed the shot (the second shot), but I didn't know where it went. We was both standing, wasn't no shot fired when we was down. There was only two shots, and we was both on our feet; we wasn't down till the very last finish, and when he fell I fell to my knees. I got up and sheathed the gun and went away." On cross-examination he testified: "The gun went off two times, but I didn't shoot it (the second time). In the scuffle, somewhere, it was pulled off (the second time), but I don't know how nor where."

One of the defendant's witnesses testified that the defendant and Crawford continued to scuffle on their feet after the second shot was fired. On cross-examination he testified that the defendant beat Crawford "over the head" with his pistol after Crawford "was down."

The jury were instructed on murder in the first degree, murder in the second degree and self-defense.

The defendant complains of the action of the trial court in denying his request for an instruction on manslaughter, in giving the State's Instruction 7 and in refusing to give his Instruction 2.

I. It appears from direct evidence that immediately before the shooting the defendant and Crawford were quarreling, that Crawford struck the first blow in the fight which ensued, and that in the progress of the fight Crawford was shot and killed by the defendant. In view of this evidence, it was clearly the duty of the trial court to instruct the jury on manslaughter, whether requested to do so or not, and the failure of the trial court to give an instruction on manslaughter constitutes reversible error. [Sec. 3681, R. S. 1929; State v. Creighton, 330 Mo. 1176, 52 S. W. (2d) l. c. 560-562, and cases cited.] In State v. Creighton, supra, JUDGE ELLISON said: "where the record shows personal violence—a battery—inflicted upon the slayer by the deceased at the time of the homicide, the general rule is that a manslaughter instruction is called for. . . . If there is substantial evidence of lawful provocation, the defendant is entitled to an instruction on manslaughter. Proof of an initial assault and battery upon him by the deceased is such evidence because it measures up to the standard exacted by the law and in point of fact warrants an inference that heat of passion was engendered thereby."

The Attorney-General and his assistant in this case, with commendable frankness, say, in their brief: "As there was evidence tending to show that the deceased committed a personal violence or battery

upon defendant before the latter fired the fatal shot, we must concede that appellant's point that a manslaughter instruction should have been given is well taken, so that a reversal and remand of the case is, in our opinion, unavoidable under the recent controlling decisions of this court."

■ II. No error was committed by the trial court in giving the State's Instruction 7 or in refusing to give the defendant's Instruction 2.

By Instruction 7, given at the request of the State, the jury were told that, if they found "that defendant provoked the difficulty or began the quarrel between himself and deceased with the purpose of taking advantage of the deceased and of taking his life or doing him some great bodily harm," they could not acquit the defendant on the ground of self-defense. Ample support for this instruction was furnished by the evidence that the defendant made threats of violence against Crawford a few days before the shooting, that he was carrying a loaded pistol in a "scabbard" under his overcoat when he met Crawford in Gentryville on the day of the shooting, and that he started the quarrel which ended in the killing of Crawford. [State v. Bundy (Mo.), 44 S. W. (2d) 121.]

■ By his Instruction 2, the defendant sought to have the jury advised "that, under the law of this State, a person attacked is not bound to retreat in order to avoid the threatened injury, but may stand his grounds, and, if necessary to protect himself from great personal injury, may even take the life of his assailant." It will suffice to say that the subject-matter of this instruction was fully covered, in substance and effect, by instructions A, B, C, D, G and H, given at the request of the defendant. [State v. Bundy, supra.]

Because of the error of the trial court in failing to instruct the jury on manslaughter, the judgment is reversed and the cause remanded. All concur.